# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Judy Larson, Janelle Mausolf, and Karen Reese, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>      vs.<br><br>Allina Health System; the Allina Health System Board of Directors; the Allina Health System Retirement Committee; the Allina Health System Chief Administrative Officer; the Allina Health System Chief Human Resources Officer; Clay Ahrens; John I. Allen; Jennifer Alstad; Gary Bhojwani; Barbara Butts-Williams; John R. Church; Laura Gillund; Joseph Goswitz; Greg Heinemann; David Kuplic; Hugh T. Nierengarten; Sahra Noor; Brian Rosenberg; Debbra L. Schoneman; Thomas S. Schreier, Jr.; Abir Sen, Sally J. Smith; Darrell Tukua; Penny Wheeler; Duncan Gallagher; Christine Webster Moore; Kristyn Mullin; Steve Wallner; John T. Knight; and John Does 1–20,<br><br>        Defendants. | Civil Action No.: _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Judy Larson, Janelle Mausolf, and Karen Reese (collectively, "Plaintiffs"), by and through their attorneys, on behalf of the Allina 403(b) Retirement Savings Plan (the "403(b) Plan") and the Allina 401(k) Retirement Savings Plan (the "401(k) Plan," and together with the 403(b) Plan, "Plan" or "Plans"), themselves and all others similarly situated, allege the following:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1009 and 1132 against

Allina Health System ("Allina" or the "Company"), the Allina Health System Board of

Directors ("Board of Directors"), the Allina Health System Retirement Committee (the

"Retirement Committee"), the Allina Health System Chief Administrative Officer, the

Allina Health System Chief Human Resources Officer, Clay Ahrens, John I. Allen,

Jennifer Alstad, Gary Bhojwani, Barbara Butts-Williams, John R. Church, Laura Gillund,

Joseph Goswitz, Greg Heinemann, David Kuplic, Hugh T. Nierengarten, Sahra Noor,

Brian Rosenberg, Debbra L. Schoneman, Thomas S. Schreier, Jr., Abir Sen, Sally J.

Smith, Darrell Tukua, Penny Wheeler, Duncan Gallagher, Christine Webster Moore,

Kristyn Mullin, Steve Wallner, John T. Knight, and John Does 1-20 (collectively,

"Defendants").[1]

2.      Defendants are fiduciaries for the Plans and subject to the duties set forth in

ERISA – duties which are "the highest known to the law." *Braden v. Wal-Mart Stores,*

*Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).  In discharging these duties, Defendants are/were

required to determine and monitor the prudence of ***each*** investment option available to

---

[1] Plaintiffs reserve the right to add additional defendants, particularly ProManage, LLC ("ProManage"), Fidelity Management Trust Company ("FTMC") and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC"), subsidiaries of FMR, LLC ("Fidelity"), if it should later be determined via discovery or otherwise that these or other Fidelity-affiliated companies were named or functional fiduciaries with respect to the actions and inactions complained of herein.

the Plans' participants and to remove imprudent ones. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-9 (2015).

3.     Defendants' duties obligated them to not only select investment options that were prudent and through which participants could grow their retirement savings, but also to limit the Plans' expenses to a reasonable amount, and ensure that the Plans' administrative and investment structures were appropriately priced given the Plans' asset levels.

4.     The Plans are "defined contribution plans," meaning that, unlike pension plans, the Plans' participants alone are exposed to the risk of underperformance and the burden of excessive fees.  Because plans such as the Plans are the main vehicle for employees to save for retirement, the management of expenses can have a dramatic effect on the amount of money participants will have for retirement.

5.     At all relevant times, the Plans had over $1 billion in combined assets, making them "jumbo" plans in the defined contribution plan marketplace, and among the largest plans in the United States.

6.     As jumbo plans, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plans' expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans to ensure it was prudent. Instead, Defendants abdicated their fiduciary oversight, allowing the Plans' trustee, Fidelity, to lard the Plans with high-cost, non-Fidelity mutual funds through which Fidelity received millions of dollars in revenue sharing payments, while also giving

Fidelity discretion to add *any* Fidelity mutual fund that Fidelity had available, regardless of whether the funds were duplicative of other options, had high costs, were performing poorly, or were otherwise inappropriate as retirement savings options for the Plans' participants. Indeed, the Plans regularly had more than 300 separate mutual fund options, most of which were Fidelity's own mutual funds that charged "retail prices" or were funds that paid a portion of the investment management fee to Fidelity.

7. This caused the Plans, through their participants' individual accounts, to pay fees that were significantly higher than other retirement plans with similar asset levels.

8. The Plans' fiduciaries breached their duties of loyalty and prudence to the Plans and their participants, including Plaintiffs, by failing to establish and use a systematic process to monitor the performance and cost of the investment options in the Plans' portfolios. As alleged in Count I, Defendants breached their duties of loyalty and prudence by among other things: including higher cost investment options in the Plans that were detrimental to participants; allowing Fidelity to select its own proprietary funds for the Plans, as well as other funds paying fees to Fidelity for inclusion in the Plans; failing to use the Plans' high levels of assets to negotiate lower fees for certain funds and/or use collective trusts or other investment vehicles that could have lowered administrative expenses while providing substantially similar investments; failing to monitor and control the Plans' recordkeeping costs; failing to use the Plans' bargaining power to negotiate lower managed account expenses; maintaining multiple money market funds during a sustained period in which all the money market funds earned negligible or

4

even negative returns; and failing to switch higher cost and poorly performing investment options for nearly identical, or similar, cheaper and better performing options available in the market.

9.      As a result of these actions, Defendants, as fiduciaries of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to Plaintiffs and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a) and 405, 29 U.S. C. §§ 1104(a) and 1105, costing the Plans and their participants tens of millions of dollars.

10.     Plaintiffs allege in Count II that Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom they had delegated the management and administration of the Plans' assets, despite the fact that such Defendants knew or should have known that such other fiduciaries were failing to manage the Plans and their investment portfolios in a prudent and loyal manner as required by ERISA.

11.     Plaintiffs allege in Count III that certain Defendants breached their fiduciary duties to provide adequate disclosures to participants in the Plans regarding the fees and expenses charged to them by third-party providers by:  (1) failing to properly identify fees and expenses charged against individual accounts; and (2) failing to properly identify the source of the fees and expenses so charged.

12.     This action seeks to recover losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiffs' claims apply to the Plans, inclusive of all participants with accounts invested in the challenged funds during the Class Period, and because ERISA specifically authorizes

participants such as the Plaintiffs to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

14.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

15.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and because the Plans are administered in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

16.    Plaintiff Judy Larson is a resident and citizen of Roseville, Minnesota. Larson was employed by Allina from June 1983 through August 2015, first as a Physical Therapy Aide, and later as a Provider Coordinator for Rehabilitation Services.  During her employment, Plaintiff Larson participated in both Plans.  In the 401(k) Plan, Plaintiff

Larson was invested in the American Beacon Large Cap Value Fund, BlackRock Total Return, DFA International Small Company Portfolio, DFA US Targeted Value Portfolio, Fidelity Contrafund, Fidelity Diversified International Fund, PIMCO Real Return Fund, PIMCO Total Return Fund, Principal Fixed Account Annuity, Parametric Emerging Markets Fund, Spartan Total Market Index Fund and AMG Times Square Mid-Cap Growth Fund.  Plaintiff Larson was invested in these same options in the 403(b) Plan as well.

17.     Plaintiff Janelle Mausolf is a resident and citizen of Burnsville, Minnesota. Plaintiff Mausolf was employed by Allina from 2009 until 2013 as a Patient Care Coordinator.  During her employment, Plaintiff Mausolf participated in the 401(k) Plan, where she was invested in the American Beacon Large Cap Value Fund, BlackRock Total Return Fund, DFA International Small Company Portfolio, DFA US Targeted Value Portfolio, Fidelity Contrafund, Fidelity Diversified International Fund, PIMCO Real Return Fund, PIMCO Total Return Fund, Principal Fixed Account Annuity, Parametric Emerging Markets Fund, Spartan Total Market Index Fund and AMG Times Square Mid-Cap Growth Fund.

18.     Plaintiff Karen Reese is a resident and citizen of Minneapolis, Minnesota. Plaintiff Reese was employed by Allina from 2014 to 2016 as a Provider Arrangements Contracts Coordinator.   During her employment, Plaintiff Reese participated in the 401(k) Plan, where she was invested in American Beacon Large Cap Value Fund, BlackRock Total Return Fund, DFA International Small Company Portfolio, DFA US Targeted Value Portfolio, Fidelity Contrafund, Fidelity Diversified International Fund,

PIMCO Real Return Fund, PIMCO Total Return Fund, Principal Fixed Account Annuity, Parametric Emerging Markets Fund, Spartan Total Market Index Fund and AMG Times Square Mid-Cap Growth Fund.

19.     Plaintiffs are "participants" in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), because each is entitled to receive benefits from Defendants in the amount of the difference between the value of their accounts as of the time their accounts were distributed and what their accounts would have been worth at that time but for Defendants' breaches of fiduciary duty as described herein.

20.     Plaintiffs did not have knowledge of all material facts (including, among other things, the cost of the investments in the Plans relative to alternative investments that were available to the Plans but not offered by the Plans, or the fact the options were chosen by, or for the benefit of, Fidelity, and not by the Defendants or for the Participants) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plans, including Defendants' processes for selecting, monitoring, retaining, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed jumbo 401(k) plans, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans. Plaintiffs did not and could not review Committee Meeting Minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.  For purposes of this

Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

#### Company Defendants

21.    Defendant Allina Health System is the sponsor of both Plans within the meaning of 29 U.S.C. § 1002(16)(B).  *See* Allina Retirement Savings Plan Summary Plan Description dated January 1, 2015 ("SPD"), attached hereto as Exhibit 1, at 1, 26.  The Company is a health care system that provides medical care throughout Minnesota and western Wisconsin.

22.    The Company is a "Named Fiduciary" of the Plan.  *See* Allina 401(k) Retirement Savings Plan, as Restated Effective January 1, 2014 ("Plan Document"), attached hereto as Exhibit 2, at § 2.14.  The Company is also the Plan Administrator.  *Id.* at § 12.1.

23.    At all times, the Company acted through the Board of Directors ("Director Defendants"), the Chief Administrative Officer ("CAO Defendants"), the Chief Human Resources Officer ("HR Defendants"), the Plans' Administrator(s) ("Plan Administrator Defendants"), and Retirement Committee, identified below, to perform Plan-related fiduciary functions in the course and scope of their employment.  According to the Plan Document, "[e]xcept in cases where the Plan expressly provides to the contrary, action on behalf of the Company may be taken by any of the following:  (a) The Board, (b) The Chief Administrative Officer or the Senior Vice President, Human Resources of the Company, [and] Any person or persons, natural or otherwise, or committee, to whom

responsibilities for the operation and administration of the Plan are allocated by the Company….” *Id.*

24.   Through the Board of Directors, the CAO Defendants, and/or the HR Defendants, Allina had the authority and discretion to hire, appoint or designate, and the concomitant duty to monitor and supervise the Retirement Committee and the Plan Administrator Defendants.  By failing to properly discharge their fiduciary duties under ERISA, the Director Defendants, the CAO Defendants, the HR Defendants, and the Plan Administrator Defendants breached duties they owed to the Plans and their participants. The actions of these Defendants are imputed to Allina under the explicit terms of the Plans and/or the doctrine of *respondeat superior*, and Allina is liable for these actions.

25.   The Summary Plan Description also states, “Allina may add, delete, or change [investment] options from time to time as conditions warrant.”  SPD at 12.

26.   Allina is accordingly a fiduciary of both Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it is a named fiduciary and also exercises discretionary authority or discretionary control concerning management of the Plans, as well as discretionary authority and responsibility with respect to the administration of the Plans and the disposition of the Plans’ assets.

### Director Defendants

27.   As noted above, action on behalf of the Company may be taken by the Board of Directors.  *See* Plan Document at § 12.1. Upon information and belief, the Director Defendants, as agents of Allina, are/were responsible for appointing/designating and monitoring members of the Retirement Committee – a committee to whom certain

responsibilities for the operation and administration of the Plan was allocated by the Company. Accordingly, each of the Director Defendants identified below is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

28. Defendant Clay Ahrens ("Ahrens") served as a member of the Board of Directors during the Class Period.

29. Defendant John I. Allen, M.D., ("Allen") served as a member of the Board of Directors during the Class Period.

30. Defendant Jennifer Alstad ("Alstad") served as a member of the Board of Directors during the Class Period.

31. Defendant Gary Bhojwani ("Bhojwani") served as a member of the Board of Directors during the Class Period.

32. Defendant Barbara Butts-Williams, Ph.D., ("Butts-Williams") served as a member of the Board of Directors during the Class Period.

33. Defendant John R. Church ("Church") served as a member of the Board of Directors during the Class Period and currently serves as its chair.

34. Defendant Laura Gillund ("Gillund") served as a member of the Board of Directors during the Class Period.

35. Defendant Joseph Goswitz, M.D., ("Goswitz") served as a member of the Board of Directors during the Class Period.

36.    Defendant Greg Heinemann ("Heinemann") served as a member of the Board of Directors during the Class Period.

37.    Defendant David Kuplic ("Kuplic") served as a member of the Board of Directors during the Class Period.

38.    Defendant Hugh T. Nierengarten ("Nierengarten") served as a member of the Board of Directors during the Class Period.

39.    Defendant Sahra Noor, R.N., ("Noor") served as a member of the Board of Directors during the Class Period.

40.    Defendant Brian Rosenberg, Ph.D., ("Rosenberg") served as a member of the Board of Directors during the Class Period.

41.    Defendant Debbra L. Schoneman ("Schoneman") served as a member of the Board of Directors during the Class Period.

42.    Defendant Thomas S. Schreier, Jr., ("Schreier") served as a member of the Board of Directors during the Class Period.

43.    Defendant Abir Sen ("Sen") served as a member of the Board of Directors during the Class Period.

44.    Defendant Sally J. Smith ("Smith") served as a member of the Board of Directors during the Class Period.

45.    Defendant Darrell Tukua ("Tukua") served as a member of the Board of Directors during the Class Period.

46.     Defendant Penny Wheeler, M.D., ("Wheeler") served as a member of the Board of Directors during the Class Period.  She is also the President and the Chief Executive Officer of Allina.

47.     Defendants Ahrens, Allen, Alstad, Bhojwani, Butts-Williams, Church, Gillund, Goswitz, Heinemann, Kuplic, Nierengarten, Noor, Rosenberg, Schoneman, Schreier, Sen, Smith, Tukua, and Wheeler are collectively referred to herein as the Director Defendants.

## Retirement Committee Defendants

48.     The Retirement Committee is a "committee, to whom responsibilities for the operation and administration of the Plan[s] are allocated by the Company."  Plan Document at § 12.1.  Per the Summary Plan Description, "[t]he Core Investment Options [of the Plans are] selected by the Allina Health Retirement Committee."  SPD at 12.

49.     The members of the Retirement Committee are currently unknown to Plaintiffs.  During the Class Period, each member of the Retirement Committee is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

## Chief Administrative Officer Defendants

50.     As noted above, action on behalf of the Company may be taken by the Chief Administrative Officer of the Company.  *See* Plan Document at § 12.1.  During the Class Period, the Chief Administrative Officer is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because the Chief

Administrative Officer exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets. *See* Plan Document at §§ 12.1 and 12.2.

51.     Defendant Duncan Gallagher ("Gallagher") was previously the Chief Financial Officer and Chief Administrative Officer of the Company from the start of the Class Period until January 2017.

52.     As Chief Administrative Officer, Defendant Gallagher exercised discretionary authority with respect to the management and administration of the Plans.

53.     Defendant Gallagher, his successor, and any individual acting on behalf of the Chief Administrative Officers, are collectively referred to herein as the Chief Administrative Officer Defendants.

### Human Resources Officer Defendants

54.     As noted above, action on behalf of the Company may be taken by the Senior Vice President, Human Resources of the Company.  *See* Plan Document at § 12.1. Accordingly, during the Class Period, the Human Resources Officer was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because the Human Resources Officer exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.  *See* Plan Document at §§ 12.1, 12.2, and 13.1.

55.     Defendant Christine Webster Moore ("Moore") is the Senior Vice President, Human Resources Officer of the Company and has been in this position since

2015.  In her role as the Human Resources Officer, Defendant Moore signed the Allina 401(k) Retirement Savings Plan Document.  *See* Plan Document at 69.

56.     As Human Resources Officer, Defendant Moore exercised discretionary authority with respect to the management and administration of the Plans.

57.     Defendant Moore, her predecessor during the Class Period, and any individual acting on behalf of the Human Resources Officers, are collectively referred to herein as the HR Defendants.

### Plan Administrator Defendants

58.     The Company labels itself as "the 'administrator' of the Plan for purposes of ERISA."  Plan Document at § 12.1.  The Plan Document further states:

> Except as expressly otherwise provided herein, the Company shall control and manage the operation and administration of the Plan and make all decisions and determinations incident thereto.  In carrying out its Plan responsibilities, the Company shall have full discretionary authority to construe the terms of the Plan and to make any factual determinations necessary to determine eligibility for benefits or the amount of any benefits.  It is intended that the Company have discretion to the fullest extent permitted by law and that the Company's exercise of its discretion be given deference to the greatest extent allowed under the law.

*Id.*

59.     During the Class Period, certain individuals acted on behalf of the Company as Plan Administrators.

60.     Defendant Kristyn Mullin ("Mullin") was previously Director of Human Resources-Clinic Division, Director of Benefits and Associate General Counsel at Allina Health.   She currently serves as Vice President, Human Resources at Abbott

Northwestern Hospital, one of the hospitals in the Allina Health System.  In her role as Plan Administrator, Defendant Mullin signed the Form 5500 for the benefit year 2011 for both Plans, and signed the Trust Agreement between the Company and FMTC in 2012.

61.    Defendant Steve Wallner ("Wallner") is the Vice President, Compensation & Benefits for Allina, a position he has held since 2010.   In his role as Plan Administrator, Defendant Wallner signed the Forms 5500 for the benefit years 2012 and 2015 for both Plans.

62.    Defendant John T. Knight ("Knight") signed the Forms 5500 for the benefit years 2013 and 2014 for both Plans as Plan Administrator.  Upon information and belief, Defendant Knight is a senior executive of Allina.

63.    As Plan Administrators, Defendants Mullin, Wallner, and Knight exercised discretionary authority with respect to the management and administration of the Plans.

64.    The Plan Administrators, and any individual acting on behalf of the Plan Administrators, including Defendants Mullin, Wallner, and Knight, are collectively referred to herein as the Plan Administrator Defendants.

65.    The Plan Administrator Defendants are/were fiduciaries of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

### John Doe Defendants

66.    To the extent that there are additional officers and employees of Allina who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment

manager for the Plans during the Class Period, including members of the Retirement Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-20 include, but are not limited to, Allina officers and employees who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY BREACHES

67.    During the Class Period, each Defendant is/was a fiduciary of the Plans, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

68.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

69.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with

respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

70.     At all times relevant to this Complaint, Defendants are/were fiduciaries of the Plans because:

      (a)     they were so named; and/or

      (b)     they exercised authority or control respecting management or disposition of the Plans' assets; and/or

      (c)     they exercised discretionary authority or discretionary control respecting management of the Plans; and/or

      (d)     they had discretionary authority or discretionary responsibility in the administration of the Plans.

71.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments, solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence.

72.     The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. As

noted in Advisory Opinion 88-16A, issued by the United States Department Of Labor ("DOL"):

> …in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

73.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plans and their participants and beneficiaries, the Plans' fiduciaries included and retained in the Plans many mutual fund investments that were more expensive than necessary, that returned an improper benefit to the Fidelity-affiliated service providers and/or ProManage, and otherwise were not justified on the basis of their economic value to the Plans.  Most egregiously, they diluted the bargaining power of the Plans to include hundreds of poorly received, expensive options, insuring that all Participants paid higher fees than necessary.

74.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA also mandates that fiduciaries act with prudence in the disposition of plan assets and the selection and monitoring of investments, including all associated fees.

75.     During the Class Period, upon information and belief, Defendants failed to have an independent system of review in place to ensure that participants in the Plans

were being charged appropriate and reasonable fees for an appropriate number of investment options.   Defendants also failed to monitor the performance of these investments and refused to remove investments that performed well-below their competitors.  Additionally, Defendants failed to leverage the size of the Plans to negotiate lower expense ratios for certain investment options maintained or added to the Plans during the Class Period.

## V.   CLASS ACTION ALLEGATIONS

76.    Plaintiffs bring this action as a class action on behalf of themselves and the proposed Class defined as follows:[2]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the 403(b) Plan and/or the 401(k) Plan, at any time between August 18, 2011 and the present.

77.    The members of the Class are so numerous that joinder of all members is impractical.   Upon information and belief, the Class includes tens of thousands of persons.

78.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all members of the Class, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

---

[2] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

79.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

   A.     Whether Defendants are fiduciaries of the Plans;

   B.     Whether Defendants breached their fiduciary duty of loyalty with respect to the Plans by virtue of the actions and inactions alleged herein;

   C.     Whether Defendants breached their fiduciary duty of prudence with respect to the Plans by virtue of the actions and inactions alleged herein;

   D.     Whether the Company, Director, CAO, and HR Defendants breached their duty to monitor other Plan fiduciaries;

   E.     Whether the Company and the Plan Administrator Defendants breached their disclosure obligations under ERISA;

   F.     Whether the Plans' fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

   G.     The proper measure of monetary relief; and

   H.     The nature of any equitable relief that should be imposed.

80.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs

are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

81.     This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

82.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.     THE PLANS

83.     Each of the Plans is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans each provided for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such

participant's account.  The retirement benefits the Plans provide are based solely on the amounts allocated to each individual's account.

84.     Per the Summary Plan Description, "both [Plans] generally operate in the same way."  SPD at 1.  Accordingly, the SPD applies to "either plan, unless" specifically noted.  *Id.*

85.     As noted in the SPD, the Plans are "designed to give employees an opportunity to save for retirement on a 'before-tax' basis."  SPD at 1; *see also* Plan Document at § 1.1 ("The Plan has been established so that eligible employees may have an additional source of retirement income.").

86.     The Plans are funded primarily from employee salary deferrals.  SPD at 9-10.

87.     Between the beginning of 2011 and the end of 2015, the 403(b) Plan maintained between $925.4 million and $1.08 billion in assets, and currently has more than 19,500 participants.  In October 2010, new participant entry into the 403(b) Plan was frozen, and by January 1, 2011, all employee salary deferrals, Employer matching contributions, and discretionary employer contributions were frozen as well.

88.     Between the beginning of 2011 and the end of 2015, the 401(k) Plan maintained between $371.7 million and $1.19 billion in assets, and currently has more than 28,000 participants.  In conjunction with the amendments freezing the 403(b) Plan, effective January 1, 2012, all eligible Allina employees became participants in the 401(k) Plan, and since that time all deferral elections and employer contributions have been received within the 401(k) Plan.

89.   A large number of participants in the Plans have accounts in both the 403(b) Plan and the 401(k) Plan.   Though the Plans' Forms 5500 do not disclose the number of unique participants in the Plans, Plaintiffs estimate that the Plans had approximately 25,000 unique participants as of the end of 2011, and currently have approximately 31,000 unique participants.

**Management of the Plans' Assets**

90.   Fidelity Management Trust Company (referred to herein as FMTC) is the trustee of the 401(k) Plan and the custodian of the 403(b) Plan.   FMTC provides recordkeeping, management, and trustee services to the Plans.   Upon information and belief, FMTC selects the menu of investment options available under the Plans, subject only to "rubber stamp" approval by the Company and/or Retirement Committee for inclusion and/or retention in the Plans.   FMTC is a wholly owned subsidiary of FMR, LLC, otherwise known as Fidelity Investments, Inc., which is a trade name owned by FMR.

91.   Fidelity Investments Institutional Operations Company, Inc., otherwise referred to herein as FIIOC, is a registered investment broker and acts as the broker for both Plans.   All purchases and sales of any investment within the portfolios of the Plans are processed by FIIOC.

92.   FMTC provides a suite of recordkeeping services to the Plans that includes customer service (telephone and online), trustee services (including accounting of contributions and investments and transaction processing), participant reporting in quarterly statements and online upon demand, year-end reporting, participant

communication and education services through email, internet, and print communications, discrimination testing, and loan processing.  This is a relatively typical suite of recordkeeping services for Plans of this size.

93.     Although FMTC was responsible for performing recordkeeping services for two defined contribution plans, because the Plans were administered in an identical fashion, this fact had virtually no effect on the level of services that FMTC was required to provide to the Plans compared to the services it would have had to provide to a single plan.  Further, because the 403(b) Plan was frozen to new contributions and participants near the beginning of the Class Period, FMTC only had to process contributions and investment elections for one plan.  The lack of contributions to the 403(b) Plan by and large also obviated the need to perform nondiscrimination testing on both plans, given that nondiscrimination tests primarily measure contribution levels of different groups of employees.

94.     ProManage, LLC, headquartered in Chicago, Illinois, is the firm appointed by the Company to provide investment management services "with respect to assets held in the individual Plan accounts of Participants who do not elect to opt out of the ProManage Service."  *See* Trust Agreement Between Allina Health System and Fidelity Management Trust Company Allina 401(k) Retirement Savings Plan Trust ("Trust

Agreement"), attached hereto as Exhibit 3, at 14.  Such services are provided "pursuant to an investment management agreement."  *Id.*[3]

95.     Both Plans are so-called "jumbo plans," or plans which manage at least $1 billion in assets, and as such, wield tremendous bargaining leverage to readily obtain high-quality investment management and administrative services at a very low cost. Moreover, because both Plans are administered nearly identically by the Company, their bargaining power is roughly equivalent to the size of a $2 billion plan in the marketplace.

96.     Prudent fiduciaries of all 401(k) and 403(b) plans must regularly monitor the performance of services providers and investment options, and consider potential alternative plan service providers or investment options based on cost, quality of service, and, in the case of investment management, expected returns.  This is particularly true of prudent fiduciaries of jumbo plans, like the Plans.  In addition to monitoring investment options and considering alternatives, prudent fiduciaries seek competitive bids for administrative services, including recordkeeping, every 3-5 years, as detailed below.

97.     Prudent fiduciaries of jumbo plans regularly review investment management services, to make sure that comparable services are not available at a lower cost, and that other investment managers or products are not likely to achieve superior future returns.

---

[3] ProManage is not affiliated with Fidelity, but upon information and belief, may have a separate revenue-sharing agreement with FTMC, FIIOC, or another Fidelity-affiliated company.

98.     Instead of using the Plans' collective bargaining power to obtain such services at extremely low costs, to benefit participants and beneficiaries, the Plans' fiduciaries selected and retained over 300 investment options, diluting the bargaining power of both Plans such that participants paid higher fees for those options.  The vast majority of these options were either managed by Fidelity-affiliated companies or provided a significant portion of their investment management fees to Fidelity-affiliated companies.  These investments were included at the request of Fidelity in order to benefit Fidelity, not because they were expected to outperform or otherwise be superior to other comparable investments.

99.     Both Plans also share the same qualified default investment, a set menu of options within the Plans, with funds allocated by a default investment mix "provided by" ProManage.

100.    When participants in either Plan are enrolled, their assets are automatically invested by the ProManage PROgram, which allocates a participant's contributions to 11 set investments according to an investment mix in the Trust Agreement.  *See* Trust Agreement at 52.  However, ProManage supposedly considers the participant's account balance, projected Social Security income, and age in allocating assets to the diversified equity, bond, and fixed income holdings, according to documents distributed to participants in the Plans.

101.    Participants' assets are split among the following 11 holdings in the default investment, which the Company considers the "Core Investments":

- American Beacon Large Cap Value Fund – Class Institutional

27

- AMG TimesSquare Mid Cap Growth Fund – Class Institutional

- BlackRock Total Return Fund – Class K[4]

- DFA International Small Company Portfolio – Institutional Class

- DFA U.S. Targeted Value Portfolio – Institutional Class

- Fidelity Contrafund – Class K

- Fidelity Diversified International Fund – Class K

- Parametric Emerging Markets Fund – Class R6[5]

- PIMCO Real Return – Institutional Class

- Principal Fixed Account (an annuity)

- Fidelity Total Market Index Fund – Institutional Class

102.    In addition to the fees charged by each of these investments, ProManage also charges participants a monthly fee, of up to 0.35% of their invested assets in the Plans, or 35 basis points.  As of October 31, 2015, the average fee to participants in the Plans was 7.01 basis points, deducted on a monthly basis.

103.    Participants who do not want to invest in the default investment must actively elect other investment options.  Participants who do not want to participate in the ProManage PROgram must call a Fidelity number, speak to a Fidelity employee, and select from a menu of options managed by, or paying kickbacks — in the form of

---

[4] Prior to 2015, the assets allocated to the BlackRock Total Return Fund were allocated to the PIMCO Total Return Fund – Institutional Class.

[5] Prior to 2015, the Parametric Emerging Markets Fund option was invested in Institutional Class Shares.

revenue sharing and other service credits — to, Fidelity.  There is no other way to opt out of the ProManage PROgram.

104.    The inclusion of the ProManage PROgram and participants' automatic inclusion provided participants with minimal benefit for the amounts charged.

105.    It can be reasonably inferred from the above circumstances that Defendants did not undertake, at any time during the Class Period, a systematic review of the investment options to ensure the prudence, both in performance and cost, of the investment options.  Such action and inaction caused the Plans, and hence participants in the Plans, to pay unreasonable fees for investment options.

## VII.    <u>SPECIFIC ALLEGATIONS</u>

### A.    **The Importance of the Investment Options Available to Plan Participants**

106.    The Company established and maintained the Plans for the benefit of the employees of Allina and most of its subsidiaries.  At all relevant times, the Plans have included a number of investment options, mostly mutual funds.  Specifically, over the course of the Class Period, each Plan included over 300 investment options.  *See* Appendix A (list of the mutual fund investment options available within the Plans during the Class Period).

107.    Each investment option within the Plans charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index.  Because they are

simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

108.   By contrast, actively managed funds, which generally invest in fewer securities, have higher fees, to account for the work of financial planners attempting to "beat the market" (though few do), and kick back "revenue sharing" payments made to 401(k) recordkeepers, like Fidelity, and others.

109.   Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act § 7.  *See also* DOL, *A look at 401(k) Plan Fees* (Aug. 2013), at 2, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited August 18, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.")  This is because, as described by the DOL, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years. *Id.*

110.   Nor is a reduction in a plan participant's account balance merely academic. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  *See* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/money/blogs/planning-to-

retire/2014/05/13/the-top-10-sources-of-retirement-income (last visited August 18, 2017)

("'The 401(k) is the major source people think they are going to rely on.'")[6].  Although at

all times these accounts are fully funded, that does not prevent a plan's participants from

losing money due to poor investment menu construction by plan fiduciaries, whether due

to poor performance or high fees.

> **B.**     **Improper Management of an Employee Retirement Plan Can Cost a Plan's Participants Millions in Savings**

111.    The DOL has explicitly stated that employers are held to a "high standard

of care and diligence" and must both "establish a prudent process for selecting

investment options and service providers" and "monitor investment options and service

providers once selected to see that they continue to be appropriate choices," among other

duties.  *See* "*A look at 401(k) Plan Fees*."

112.    The duty to evaluate and monitor fees includes fees paid directly by Plan

participants to investment providers, usually in the form of an expense ratio, or a

percentage of assets under management within a particular investment.  *See* Investment

Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees,

and Expenses*, (July 2016), at 4.  "Any costs not paid by the employer, which may

include administrative, investment, legal, and compliance costs, effectively are paid by

plan participants."  *Id*. at 5.

---

[6] Although most of the articles cited herein do not speak to 403(b) plans specifically, 403(b) plans are merely retirement savings plans available only to tax-exempt non-profit entities, such as hospitals.  Functionally, they are identical to 401(k) plans, specifically in that they an alternative to a traditional pension plan and all monies are allocated to investment options selected by the plan sponsor.

113.  Because the investment choices for plan participants are limited, Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

114.  On average, there are lower expense ratios for employer-sponsored retirement plan participants than those for other investors.  *See The Economics of Providing 401(k) Plans*, at 11.  ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, leading to great competition among mutual funds in the marketplace.  Furthermore, the large average account balances of such plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds. *Id*. at 10.

115.  This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000.  In fact, these expense ratios have fallen 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds.  *Id*. at 1.

116.  The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years[7].

_____

[7] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

117.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, investigating alternatives in the marketplace, and leveraging the size of their plan to ensure that well-performing, low cost investment options are being made available to plan participants. This is especially critical because 401(k) accounts are long-term investments in which employees dutifully invest during their working career, often over a period of decades, for the purpose of saving for retirement.

118.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a

---

because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*,

The  Washington  Post,  available  at  https://www.washingtonpost.com/news/get-

there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/    (last    visited

August 18, 2017) (citing a study by S&P Dow Jones Indices which looked at 2,862

actively managed mutual funds, focused on the top quartile in performance and found

most did not replicate performance from year to year).  In fact, one of the key findings in

a study conducted by Morningstar study was:

> Actively managed funds have generally underperformed their
> passive counterparts, especially over longer time horizons,
> and experienced high mortality rates (*i.e.* many are merged or
> closed).  In addition, the report finds that failure tends to be
> positively correlated with fees (*i.e.* higher cost funds are more
> likely to underperform or be shuttered or merged away and
> lower-cost funds were likelier to survive and enjoyed greater
> odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2

(June                          2015),                          available                          at

http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-

PassiveBarometerJune2015.pdf (last visited August 18, 2017).

119.   Conversely, mutual funds with the worst performance tend to continue to

perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of*

*the    Worst    Performing    Mutual    Funds*,    at    6    (2004),    available    at

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf

(last visited August 18, 2017) (attributing continuing poor mutual fund performance to

less responsive investors who do not pull their capital from the funds, causing the fund manager to change strategies).

120.   Plan fiduciaries such as Defendants must be continually mindful of investment options to ensure such options do not unduly risk plan participants savings and do not charge unreasonable fees.   Some of the best investment vehicles for these goals are collective trusts and separate accounts, which provide lower fee alternatives to even institutional and retirement plan specific shares of mutual funds.   In selecting collective trusts and separate accounts, plan fiduciaries overseeing large plans can leverage the size of their plans to negotiate significantly lower fees.   However, even collective trusts and separate accounts must be actively monitored and continually evaluated to ensure that plan participants are not paying higher fees than necessary or subject to unduly poor performance on their investments.

121.   Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select proprietary funds of service providers as investment options for the plans they administer.   The inherent conflict of interest in such situations can cause service providers' own funds to be selected when they are not the most prudent investment option and can cause those funds to remain investment options despite poor performance or higher fees than other market alternatives.

122.   In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds.   *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund*

*investment Options in 401(k) Plans*, at 2 (May 2015).   Moreover, even though plan participants may be aware of the affiliation, due to their documented naivety in investments and general inactiveness in changing those investments, the study found "participants are not generally sensitive to poor performance and do not undo the [] bias towards affiliated families [of funds]."   *Id.* at 3.

123.   The fact that fiduciaries may have "superior information about their own proprietary funds" does not correlate to improved performance.   *Id.*   "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 3, 26.

124.   A plan's fiduciaries therefore must be especially vigilant when a plan's service provider populates its menu of investment options with proprietary funds.

###   C.   Defendants' Breaches of Fiduciary Duty

####   1.   Defendants Abdicated to Fidelity the Fiduciary Oversight of the Plans

125.   The Company and those Defendants to whom it delegated authority over the Plans' assets, breached their fiduciary duties by effectively outsourcing nearly all of their duties to review, select, maintain and administer the investment options in the Plan to ProMange, FTMC and its affiliate, FIIOC.   It appears Defendants merely "rubber-stamped" their recommendations.

126.    By an agreement dated January 1, 2012, the Plan hired FTMC to serve as trustee for the trust holding the 401(k) Plan's assets.  *See generally*, Trust Agreement. Schedule C to the Trust Agreement listed the investment options in which the Plan's participants could invest their retirement assets.  There were thirteen (13) mutual funds listed as "Core Investments," of which four were managed by Fidelity.  The Plan also included "expanded investments," which included ___*all*___ Fidelity mutual funds available for investment by defined contribution retirement plans, all Fidelity mutual funds to be created in the future which will be available for investment by defined contribution retirement plans, and one-hundred and three (103) additional mutual fund options that were labeled "Non-Fidelity Mutual Funds," each of which paid Fidelity for inclusion in the Plans through revenue sharing or other service credits.

127.    Thus, the Plan Administrator gave Fidelity unlimited, unchecked authority to add its own mutual funds as investment options for the Plan.  *See* Trust Agreement at Schedule C, § II.A.

128.    By virtue of this agreement, Fidelity added over 150 Fidelity Mutual Funds without any fiduciary review by Defendants.

129.    Defendants acknowledge in the Summary Plan Description that they do not monitor any of the non-Core Investments, which would include the Fidelity options Fidelity is permitted to add at will.  *See* SPD, at 13 ("You should note in particular that Allina only monitors the Core Investment Options it has selected").  The Company denies that it even selects the remaining hundreds of options.  *See id.* at 12 (noting that among available investment options for the Plans' participants is "[a] mutual window offering

over 200 mutual fund options (these funds are <u>not</u> selected or monitored by the Allina

Health Retirement Committee)") (emphasis in original).

130. However, the mutual fund marketplace is substantially larger than the 300

or so options available for selection in the Plans, thus some selection process took place

to provide those 300 investment options. From 2011 to 2015, there were between 7,588

and 8,116 mutual funds available in the marketplace, in 22,283 to 25,038 available share

classes. *See* ICI *2016 Investment Company Fact Book*, Table 1, p. 172. As the Plans'

fiduciaries, only Defendants should be able to select the options available for investment

in the Plans.

### a. Prudent Fiduciaries Monitor the Selection and Maintenance of All Plan Investment Options

131. The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a

plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). *Tibble* held

that "an ERISA fiduciary's duty is derived from the common law of trusts," and that

"[u]nder trust law, a trustee has a continuing duty to monitor trust investments and

remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with

approval the Uniform Prudent Investor Act (the "UPIA"), treatises, and seminal decisions

confirming the duty.

132. The UPIA, which enshrines trust law, recognizes that "the duty of prudent

investing applies both to investing and managing trust assets. . . ." *Id.* (quoting Nat'l

Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c)

(1994)). The official comment explains that "'[m]anaging' embraces monitoring, that is,

the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  UPIA § 2 comment.

133.    As described *supra*, one of the responsibilities of the Plans' fiduciaries is to select investment options which have reasonable and not excessive fees for the performance and quality of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007).  *See also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to produce in the investment function.")  Adherence to these duties requires regular performance of prudent investigation of existing investments in the Plans to determine whether any of the Plans' investments are improvident, or if there is a superior alternative investment to any of the Plans' holdings.

134.    As the amount of assets under management approaches and exceeds $1 billion, the economies of scale dictate that lower cost investment options will be available to these plans.  Yet, the Plans have failed to leverage their size by utilizing the lowest-cost share classes of the investments within the Plan and considering alternative investment options and structures.

135.   From the beginning of the Class Period, both Plans had the following assets available for benefits, invested in a combination of mutual funds, pooled separate accounts,[8] and guaranteed investment contracts:

| Year | 401(k) Plan | 403(b) Plan | Total |
|------|-------------|-------------|-------|
| 2011 | $351,552,839 | $925,435,421 | $1,276,988,260 |
| 2012 | $540,804,141 | $981,125,876 | $1,521,930,017 |
| 2013 | $922,119,203 | $1,080,469,015 | $2,002,588,218 |
| 2014 | $1,103,695,683 | $1,058,146,518 | $2,161,842,201 |
| 2015 | $1,231,192,531 | $978,311,217 | $2,209,503,748 |

136.   By a wide margin, investments in mutual funds dominated each of the Plans' portfolios, being on average 82% of all assets in the 401(k) Plan and 85% of all assets in the 403(b) Plan throughout the Class Period.   Moreover, the mutual fund options, as well as the guaranteed investment contracts, are all managed by FMTC, such that between 90% and 97% of all assets in the 401(k) Plan and 100% of assets in the 403(b) Plan were under FMTC's management for the entirety of the Class Period.

137.   Allina, through FMTC, selected and recommended that approximately 318 mutual fund options be made available to the Plans throughout the Class Period.   At no time during the Class Period were there fewer than 290 options available in either of the Plans.   In total, 318 mutual options were made available to participants in the Plans during the Class Period.  *See* Appendix A.

---

[8] Pooled separate account investment options were only made available in the 401(k) Plan, but consisted of less than $3 million in assets for the whole of the Class Period. They were not an option managed by FMTC or FIIOC.

138.   Structuring the Plans in this highly unusual way served only to benefit Fidelity, in the form of higher fees, and not the Plans' participants and beneficiaries.

b.   **Defendants' Abdication to Fidelity is Evident in the Imprudent and Unusual Duplication of Asset Categories Within Each Plan**

139.   As can be expected with so many options in the Plans, there were many similar options available to the participants in each year, unnecessarily duplicating asset categories in ways not seen in prudently managed plans.  This duplication is illustrated by the following chart:



140.   Industry best practices in 401(k) plan menu construction include selecting one fund per asset class.  *See* Lawton, Robert C., "10 Best Practices for 401(k) Investment Menu Selection," available at https://www.benefitnews.com/opinion/10-best-practices-for-401-k-investment-menu-selection (last visited August 18, 2017) (suggesting a target number of options in a retirement plan to be around 25 options.)  *See also* Stone,

Donald, "Investment Selection and Monitoring: A Practical Approach to Best Practices," available at http://www.401khelpcenter.com/401k/stone_investment_selection.html#.WRoKp2eGMd U (last visited August 18, 2017) ("Simply offering a lot of funds does not necessarily mean that participants are being offered a broad range of funds…the menu [should] not inadvertently tilt toward a  particular asset class exposure by offering multiple funds offerings in one or two asset classes, simply because the funds were available.")

141.   Even within a category, there would be many multiples of similar style investments.  For instance, within the Large Cap category (which included mutual funds that invested in the stocks of companies with a large market capitalization), there were 24 Large Cap Blend funds and 26 Large Cap Value funds.  Within the Allocation category (in which the funds invest in a mix of equities and bonds according to a set percentage), of the 14 options, nine of them were for mutual funds in the 50% to 70% equity range.

142.   In fact, the Plans had over *12 times* the median number of options compared to other $1 billion 401(k) Plans, as shown by the following chart from ICI:



*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014, December 2016, ("ICI Close Look 2014"), at 31.

143.   The Plans had a staggering number of investment options, well outside industry norms.  The number of options negated the ability of the Plans to invest in lower-cost institutional shares of identical investments because the Plans' money was spread over hundreds of options, which lowered the amount of money for each option such that only more expensive shares of the funds were available to the participants for purchase.  As a result, Fidelity was able to charge higher fees, far higher than the Plans would pay if the Plans limited the number of investment options as prudent fiduciaries do.  The decision to include hundreds of options thus benefitted Fidelity, at the expense of the Plans.

144.   The amount of options also made it nearly impossible for Defendants to review the Plans' options on a regular and systematic basis to assess their prudence. Indeed, the Plans' fiduciaries admit they failed to evaluate the non-core options.  This failure to evaluate the prudence of each of the investment options directly benefitted

Fidelity while condemning the Plans' participants to high fees and the resulting poor performance.

145.    For example, 199 of the mutual fund options available in the Plans were Fidelity-managed investments.  All investment options with names such as "Fidelity," "Spartan," or "Strategic Advisers," were all mutual funds whose management fees flowed directly to a Fidelity-affiliated entity.

146.    Similarly, another 103 of the mutual fund options available in the Plans provided "indirect compensation" to FIIOC, sharing between 25 and 55 basis points of the fees charged to participants in the Plans with the Plans' service provider.  Fidelity received this indirect compensation from the mutual funds, which collected the fees from the investments of Plan participants, including Plaintiffs.  Mutual funds managed by Calvert, Invesco, Wells Fargo, Templeton, AMG Managers, Morgan Stanley, Lord Abbett, and Royce, among others, all directly benefited Fidelity-affiliated companies.

147.    In 2015, only 12 options did not share any fee revenue with FIIOC, including the options offered by DFA, BlackRock, and Vanguard.

148.    The money market funds and large cap blend funds, are all either Fidelity-run mutual funds or mutual funds that share fees with FIIOC.  Fidelity-managed funds comprise all 11 of the money markets funds that were in the Plans, and 21 of 24 large cap blend funds.  Of the remaining three large cap blend funds – ClearBridge Value Trust, the Domini Impact Equity Fund, and the Oakmark Fund – each of them shared revenue with FIIOC.

149.    Defendants failed to adequately perform a systematic review of the reasonableness of the Plans' investment options and structure, both for performance and in expenses, at least in part because of the large number of options in the Plans.  As a result, participants paid excessively high fees — which benefitted Fidelity — due to the Defendants' failure to assess the reasonableness of investment option performance and fees in light of other alternatives available on the marketplace.

### c.    Defendants' Abdication of Fiduciary Responsibility is Also Shown in the Inclusion of, and Failure to Remove, Untested or Inferior Investments From the Plans

150.    Further evidence of this lack of oversight on the part of the Defendants comes from examining the mutual fund options that were removed from the Plans during the Class Period.  With only one exception, the funds that were removed were removed because the individual fund manager closed the fund and liquidated its assets due to poor performance and/or lack of interest from investors.  Defendants continued to offer the options until they were closed, and often, immediately added (if it was not already in the Plans) the fund from the same manager in which the former options' monies were directed if investors failed to liquidate their investment on their own.  These options included:  the American Century Vista Fund, the Hartford Growth Fund, the Invesco Constellation Fund, the Lord Abbett Small Cap Blend, the Neuberger Berman International Fund, as well as numerous Fidelity options like the Fidelity 130/30 Large Cap Fund, the Fidelity Fifty Fund, and the Fidelity Europe Capital Appreciation Fund.

151.    In general, and apart from the blind addition of options because a fund manager designated investments to an alternative fund, additions to the Plans' investment

options were nearly uniformly from Fidelity-affiliated companies, under the brand names of Fidelity, Strategic Advisers, or Spartan. These options were added on the recommendation of FTMC, and Defendants did not exercise any independent review of their recommendations before adding these options to the Plans.

152. For example, the Fidelity Global Equity Income Fund, a fund incepted in May 2012, was added to the Plans' investment options within a year, despite lackluster returns in its first months of existence. Prudent fiduciaries typically weigh a mutual fund's performance over a span of years, in order to ensure its reasonability, before offering the option to Plan participants. Instead, Defendants merely acquiesced to addition of this Fidelity option to the Plans, even though it had only a year's worth of data and that data indicated the fund was not performing as well as its benchmark.

153. This lack of a systematic, independent review led to Defendants' inclusion of many imprudent mutual fund options, especially those that returned a benefit to FTMC, FIIOC, or another Fidelity-affiliated company, and the appointment and retention of ProManage's services on an opt-out basis, costing participants in the Plans millions of dollars in unnecessary and unduly expensive fees over the course of the Class Period.

154. Allowing Fidelity to include untested or inferior investments served to benefit Fidelity, at the expense of the Plans. Accordingly, it was imprudent for Defendants to allow these funds to be added or to continue to be offered in the Plans.

**d.    Defendants' Abdication to Fidelity is Also Evident in the Failure to Prudently Leverage the Plans' Size to Negotiate Lower Fees**

155.    Fiduciaries must consider the size and purchasing power of their plan and select the investments and share classes of those investments that are most appropriate for plan participants. The "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach. *See* Fred Reish, *Classifying Mutual Funds*, PLANSPONSOR (Jan. 2011), available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537 (last visited August 18, 2017).

**(1)    Identical and Comparable Mutual Funds With Lower Fees and Better Performance Were Available For Plan Investment**

156.    Defendants' abdication of fund selection to Fidelity prevented the Plans from taking advantage of comparable, less expensive investment products available to Plans of their size.

157.    Rather than use the bargaining power afforded by the Plans' substantial assets under management to negotiate lower fees for participants in the Plans, Defendants instead opted to maintain investment options that charged fees that remained substantially similar from 2011 through 2016.

158.    That Defendants squandered the bargaining power of the Plans can easily be seen by the fact that the vast majority of the Plans' assets were invested in the same 16

mutual fund options in each of the Plans during the Class Period, despite the fact that over 300 options were available.

159.    Of these 16 high value mutual fund options, each of which had at least $10 million in assets from one of the Plans during the Class Period, 10 of them were part of the default investments:

- Fidelity Total Market Index Fund
- Fidelity Contrafund
- BlackRock Total Return Fund – prior to 2014, the PIMCO Total Return Fund
- Fidelity Diversified International Fund
- American Beacon Large Cap Value Fund
- Parametric Emerging Markets Fund – prior to 2014, in a higher priced share class
- DFA U.S. Targeted Value Portfolio
- PIMCO Real Return Fund
- AMG TimesSquare Mid Cap Growth Fund
- DFA International Small Company Portfolio

160.    Tellingly, of the high value mutual fund options, 9 of them returned a benefit to a Fidelity-affiliated business:

- Fidelity Total Market Index Fund
- Fidelity Contrafund
- Fidelity Diversified International Fund
- Fidelity Growth Company Fund
- Fidelity Freedom 2015
- Fidelity Freedom 2020
- Fidelity Freedom 2025
- Fidelity Freedom 2030
- American Beacon Large Cap Value Fund[9]

---

[9] This Fund returned up to 40 basis points of its fee to FIIOC.

161.   In fact, between 76% and 81% of the 401(k) Plan's Fidelity-managed assets were in these high value mutual fund options over the course of the Class Period, and between 82% and 83% of the 403(b) Plan's Fidelity-managed assets were in these options over the same period.

162.   Defendants did not obtain Fidelity's best price for the 401(k) Plan's most popular investment options.  For example, the 401(k) Plan had more than $30 million invested in Fidelity's "Growth Company Fund – Class K" mutual fund at a cost of 66 basis points even though Fidelity offered an identical investment through its "Growth Company Commingled Pool" at a cost of only 43 basis points.  The investments are identical.  The objective of both is to "seek() capital growth" and is targeted to investors who are "seeking the potential for long-term share appreciation."  Nine of the investments' ten largest holdings are identical, as they both have shares in companies such as Nvidia, Apple, Amazon, Alphabet and Facebook and they have a nearly identical percentage of their assets concentrated in these companies (35.15% in mutual fund version vs. 35.75% in commingled pool version).  Moreover, they have a similar total number of holdings (392 for mutual fund vs. 383 for commingled pool).  And while Fidelity's commingled pool charged a lower fee, it also offered higher returns.  The 3-year average annual return for the commingled pool investment was 35 basis points higher than the mutual fund.

163.   Defendants also caused the 401(k) Plan to pay higher expenses than it should have from Fidelity for target-date funds.  In 2015, more than $50 million in the 401(k) Plan's assets were invested in Fidelity Freedom mutual funds designed for

participants who expect to retire at a specified date (*e.g.*, 2020, 2025, etc.).   Fidelity charged the 401(k) Plan expenses of between 62 and 75 basis points for the funds.   Other similar or identical funds were available during the same time period but at lower cost. For example, during this time period, Fidelity offered the same funds in a K asset class (K-shares), which were available to the Plans, and were identical except for expenses that were 5 to 20 basis points lower than the mutual funds provided to the Plans. Additionally, Fidelity provided the same investment strategies through its index target-date funds and commingled pool investment products, both of which had much lower fee structures.   The index target date funds had expenses of 15 basis points while the commingled pools had one of 40 basis points.

164.   In addition to failing to secure lower fees by investing in institutional mutual fund share classes or comingled pools, which would have been cheaper and available to the Plans had the number of options been limited to prudent levels, a routine, systematic review of just the Plans' high value mutual fund options would have revealed other mutual funds available on the open market with similar or better performance and lower fees.

165.   This is illustrated by a comparison of the Fidelity Contrafund, a Large Cap Growth mutual fund, with the Vanguard PrimeCap Fund (Admiral Shares), also a Large Cap Growth fund, in which the Vanguard Fund largely performed as well or better than the Fidelity Fund.   Both funds are Large Cap Growth funds, meaning they invest in companies with at least $10 billion in market value which managers believe will continue to grow.   Both are heavily invested in domestic equities, with Fidelity investing 92.74%

and Vanguard investing 84.74%.  They are also comparable in both the Morningstar ratings[10] and Lipper Rankings,[11] although the Vanguard Fund fares better.  The Fidelity fund is a 4 star Morningstar fund overall and at 3 and 5 year intervals, while a 5 star fund in the 10 year category.  The Vanguard Fund is a 5 star fund overall and at 5 and 10 year intervals, while a 4 star fund in the 3 year category.  While the Fidelity fund ranked 921 out of 2,960 funds at 1 year and 472 out of 2,214 funds at 5 years, the Vanguard fund ranked 109 out of 2,960 funds at 1 year and 11 out of 2,214 at 5 years.

166.    However, the fees for the Vanguard Fund were much lower than those of the Fidelity Fund, as shown below.



---

[10] Morningstar ratings are calculated on a Morningstar Risk-Adjusted measure which emphasizes downward variations and rewards consistent performance.

[11] Lipper Rankings arrange funds by category based on their total return.

167.    Another illustrative example is a comparison of the Parametric Emerging Markets Fund in the Plan,[12] a Foreign Emerging Market fund, with DFA's Emerging Markets I Fund, a mutual fund with the same benchmark and investment style.   Both funds invested primarily in foreign stock, with the Parametric fund investing 93.05% and DFA fund investing 97.47% in the stock of companies with market values of over $10 billion, including those considered to be "growth" or "value" stocks.   The Parametric fund is a 3 star Morningstar fund overall and at the 5 and 10 year intervals, and a 2 star fund at the 3 year interval, while the DFA fund is a 4 star Morningstar fund overall and at the 10 year interval, and a 3 star fund at the 3 and 5 year intervals.   Their Lipper rankings also reflect that the Parametric fund ranked 263 out of 455 funds at 5 years and 92 out of 183 at 10 years, while the DFA fund ranked 191 out of 455 at 5 years and 44 out of 183 at 10 years.

168.    Again, the fees for the DFA fund were approximately half those of the option within the Plans (the Parametric fund).

---

[12] This option was switched to a different share class of the same Fund in 2014, information which is reflected in the following charts.



169.   Another example is the continued retention of the Fidelity Diversified International Fund, a Foreign Large Growth Fund, when alternatives such as the American Funds EuroPacific Growth Fund were available.  Both funds are concentrated in foreign stock holdings, 87.49% for the Fidelity fund and 85.28% for the American Fund.  The Fidelity fund's Morningstar ratings are 4 stars overall and for the 3 and 5 year intervals, the same as the American fund.  Similarly, the Fidelity fund received Lipper rankings of 991 out of 1,534 funds and 160 out of 1,056 funds at the 1 and 5 year marks while the American fund ranked 194 out of 1,534 and 204 out of 1,056.

170.   However, the fees of the American Fund were between 23 and 45 basis points lower during the Class Period.



171.   A prudent review of the Plans' investment options, as well as reasonable market alternatives, would have revealed such information to the Defendants.   However, because the Company and other Defendants acting on its behalf hired Fidelity and failed to exercise adequate oversight, such an impartial, routine review of each of the Plans' hundreds of options was not undertaken.

### (2)   Cheaper Collective Trusts and Separate Accounts Were Available for Plan Investment

172.   As explained by the Wall Street Journal, collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.   Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.   As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.   *See* Powell, Robert, Not Your Normal Nest Egg, The Wall Street

Journal,                March          17,             2013,              available                at

https://www.wsj.com/articles/SB10001424127887324296604578177291881550144 (last

visited August 18, 2017).

173.   Collective trust fees in fact can be between 15 bps to 60 bps lower than the

same asset class mutual fund.

174.   Similarly, separate accounts, which require a minimum investment of $15

million to $25 million per account, can "commonly" reduce "[t]otal investment

management expenses" to "one-fourth of the expenses incurred through retail mutual

funds."  DOL, *Study of 401(k) Plan Fees and Expenses*, at § 2.4.1.3, available at

http://www.dol.gov/ebsa/pdf/401krept.pdf (last visited August 18, 2017).

175.   Defendants are/were at all times during the class period aware of the

benefits of collective trust vehicles and separate accounts compared to mutual funds and

of the significant bargaining power that the Plans wielded due to the large pool of assets.

Not only is FTMC a leader in providing plan and investment-management services in the

field, Allina and the other Defendants working on its behalf were aware of these vehicles

via the inclusion of a pooled separate account in the 401(k) Plan.

176.   Furthermore, not only was FTMC aware of the existence of collective trusts

and separate pooled accounts, it and/or its affiliates provided such investment vehicles to

other large institutional clients and employee benefit plan providers.  As a result, any

Fidelity-managed option, but especially the high value options, could have been managed

by Fidelity with an identical investment strategy at significantly lower costs.

177.    Alternatively, given the size of the Plans' assets, Defendants should have investigated the use of collective investment trusts or separate accounts, to see if lower fees could be secured for similar investments to those available in the Plans.

178.    For example, during the entirety of the Class Period, rates on the actively-managed Intermediate Term Bond mutual funds within the Plans ranged between 39 and 116 basis points, depending on the mutual fund and year.  Each year of the Class Period, the Plans' investments in Intermediate Term Bond mutual funds exceeded $100 million, and for 2014, exceeded $250 million.

179.    Baird Advisors offers a separate account for an intermediate bond – Baird Advisors Core Plus Bond at a rate of 30 basis points for the first $100 million, 20 basis points for $100 million to $200 million invested and 15 basis points for over $200 million.  Other highly-regarded investment managers could have provided similar active management of an intermediate-bond strategy for a similar level of fees.

180.    Accordingly, participants in the Plans could have been paying a mere 20 to 30 basis points[13] for a similar investment for most of the Class Period.[14]  Instead, they paid 50% to 600% more for comparable investment.

---

[13] There are additional costs of administering a separate account strategy, but upon information and belief, for a strategy with $100 million or more in assets, these costs would have amounted to only 2 to 3 bps.

[14] These estimates are based on published fee records.  But separate account fees are negotiable, and are typically lower than the published rates.  Thus actual expenses would have likely been lower than these published rates.

181.    Rather than use their unique position to benefit the Plans and their participants by offering these same asset class investments in a collective trust or separate account, or by negotiating lower mutual fund fees, Defendants instead opted to offer the higher cost mutual funds because of the benefit they returned to FTMC, FIIOC and their affiliated companies.

### (3)    Failure to Consolidate or Eliminate the Least Utilized Investment Options Cost the Plans Unnecessary Fees

182.    Defendants allowed the Plans' bargaining power to be diluted because the Plans were structured for the benefit of Fidelity-affiliated companies and not for the benefit of participants in the Plans.

183.    Instead of consolidating the Plans' mutual fund options into 20 to 40 carefully selected investments whose performance, fees, and reasonability for retirement investment could be routinely assessed and then easily digested by members of the Class, as is the norm for Plans of this size, Defendants instead allowed hundreds of options into the Plans' investment menu, thereby limiting the Plans' bargaining power as to any given investment.

184.    Only 5% to 7% of the 401(k) Plan's Fidelity-managed assets and 5% to 6% of the 403(b) Plan's assets were in low value mutual fund options, characterized as options that throughout the Class Period had less than $1 million investment.  Similarly 12% to 16% of the 401(k) Plan's Fidelity-managed assets and 10% to 11% of the 403(b) Plan's assets were in mid value mutual fund options, characterized as those options with asset ranges between those of the high and low value options.

185.   Despite only comprising at best 20% of either Plan's Fidelity-managed assets at any given time, the low and mid value holdings accounted for the vast majority of options during the Class Period within both Plans as can be seen by the following charts:





186.   Despite their relative disuse by participants in the Plans, none of the Defendants undertook any systematic review of the options within the Plans' portfolios to evaluate whether these options were reasonable, appropriate, or prudent investments for

the Plans' assets.  As a result of the Plans' bloated lineup, the sheer size of the Plans made it exceedingly difficult for members of the Class to discern the good investments from the bad.

187.   The Plans continued to offer high-priced, imprudent, or unsuitable investment options throughout the Class Period, such as the Fidelity Select Automotive Portfolio.  This mutual fund, which never contained more than $500,000 of combined Plans' assets during any year of the Class Period, is Large Cap Blend option that cost between 84 and 90 basis points depending on the year.  This extremely volatile mutual fund invests in car manufacturer equities, a segment of industry known to be highly unstable, as can be seen by its performance compared to its benchmark over the Class Period.



188.   Picking a mutual fund which invests in a particular industrial sector, like the Fidelity Select Automotive Portfolio, is considered a more speculative approach to investing, because such funds are "more volatile than a broadly based stock fund" and essentially are a bet that a particular industry will fare better than the market as a whole.

*See* Friedberg, Barbara, "The Pros and Cons of Sector Mutual Funds," available at http://money.usnews.com/money/blogs/the-smarter-mutual-fund-investor/2015/02/05/the-pros-and-cons-of-sector-mutual-funds (last visited August 18, 2017).

189.   Sector funds not only expose participants to these concentrated and volatile portfolios, their presence in a plan lineup also encourages participants to engage in performance-chasing behavior by seeking the "hottest" sector, typically culminating in a buy high-sell low pattern of investing when the participant flees the sector when the industry invariably cycles out of favor.  Schaus, Stacy & Gao, Ying, *Designing Balanced DC Menus: Considering Equity Investments* (Dec. 2014), available at http://europe.pimco.com/EN/Insights/Pages/Designing-Balanced-DC-Menus-Considering-Equity-Investments.aspx (last visited August 18, 2017) ("Simplifying a menu can help participants make better selections and improve their ability to stay the course – rather than chasing performance, or, more likely, fleeing an investment, and thus locking in losses if the market suddenly drops.").

190.   Despite this fact, this mutual fund option and others from Fidelity which targeted specific segments of domestic industry, 39 in total, remained in the Plans' portfolios for the entirety of the Class Period.

191.   Even concentrating the Plans' assets into the better, lower cost performing Fidelity-affiliated options could have resulted in significant cost savings, especially when the full value of the Plans' assets were concentrated by asset class investment.  Instead, the number of options in the Plans effectively diluted the Plans' power to purchase even

the lower cost institutional shares of most of the mutual funds offered, splitting the buying power of the Plans' participants and ensuring they would be in higher-cost share classes.

192.   As a result, the Plans' participants paid much higher than average costs than participants of other $1 billion plans.  For example, in 2015, on average, the menu of mutual fund options in the Plans cost 83 basis points.  Factoring in actual selections, the Plans' participants were charged on average 55 basis points in the 401(k) Plan and 56 basis points in the 403(b) Plan.  As can be seen by the below chart from ICI, the Plans' participants were thus paying roughly double what participants in similarly-sized plans were paying.



*See* ICI Close Look 2014, at 49.

193.    Moreover, not only were the Plans' participants being charged far in excess of what they should have been in 2015, as the chart clearly shows, ***Defendants were at least seven years behind*** in evaluating the costs of investment options offered to the Plans' participants compared to similarly sized plans in the marketplace.

> **e.   Defendants' Abdication is Evidenced by the Inclusion And Maintenance of Duplicative, Poor Performing, and Expensive Money Market Funds**

194.   Money market funds are mutual funds which seek to protect the principal value of their investment while generating current income.   Often, they invest in short-term U.S. dollar-denominated money market instruments that consist of U.S. Treasury obligations.   As the DOL has explained:

> Money market accounts are actually mutual funds that invest in short term (typically 90 days or less), fixed income securities. As such, they are often considered as cash equivalents…most often used as parking accounts for money waiting to be invested in other instruments, as sweep accounts for the collection of dividends, or by very risk averse investors.[15]

195.   While some jumbo 401(k) plans offer money market funds, most offer Stable Value funds, which provide the same principle preservation benefits of Money Market Funds but with consistently higher returns.   *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

196.   Generally, stable value funds had higher returns and lower volatility during the entire relevant time period.

---

[15] DOL, *Study of 401(k) Plan Fees and Expenses*, § 2.4.4.



*See What is A Stable Value Fund*, p. 6, available at https://stablevalue.org/media/misc/Stable_Value_at_a_Glance.pdf (last visited August 18, 2017).

197.   A 2011 study from Wharton Business School analyzed money market and stable value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences."  David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011).[16]

> According to the 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[17]

---

[16]   Available at http://www.crai.com/sites/default/files/publications/stable-value-funds-performance.pdf (last visited August 18, 2017).

[17]   Available at https://www.metlife.com/assets/cao/institutional-retirement/2015_StableValueStudy_exp12-2017.pdf (last visited August 18, 2017).

The study also notes that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

198.   Here, if the Plans wanted a more liquid alternative to the Principal Fixed Account offered in both Plans, such liquidity could have been provided by numerous stable value offerings in the marketplace, rather than offering multiple, duplicative money market funds producing investment returns that were negligible at best.

199.   Because all money market funds invest in short-term, secure, low-interest instruments, there is little, other than fees, to distinguish between different money market funds.   For example, low-fee funds like the Vanguard Prime Money Market Fund (VMRXX) and BlackRock Money Market Portfolio, Institutional Shares (PNIXX) are, as of June 2017, returning 1.11% and 1.12% respectively. By comparison, the Plans offer at least six different Fidelity money market funds, with an average June 2017 yield of 0.63% and average fees of 25 basis points.

200.   Prudent fiduciaries do not offer multiple, duplicative investment options, particularly money market funds. Offering so many money market funds:  (1) increases the total amount of plan assets invested in these inferior products; (2) potentially confuses participants into making inappropriate asset allocation decisions or refraining from making prudent retirement decisions out of fear and confusion; and (3) spreads money market investments across many funds, with the Plans ending up paying higher fees as they give up bargaining power compared to utilizing a single fund.

201.   At all times during the Class Period, at least eight money market funds were available to be selected as investment options at any given time.  Over the course of the Class Period, 11 different money market funds were available, despite the fact that short-term interest rates in the United States have been at or near zero percent since the global financial crisis of 2008.[18]

202.   At all times during the Class Period, Defendants should have known that U.S. short term interest rates based on U.S. dollar-denominated treasuries, and other short-term holdings common in money market funds, were at historically low levels and, as such, these funds would have a negative return due to inflation and the fact that fees of these funds far outstripped their earnings.

203.   A good example is one of the more popular money market funds within the Plans, the Fidelity Government Cash Reserves.  This money market fund typically had over $5 million of the Plans' assets invested in it at any given year.  However, even prior to the Class Period, the fees for this fund far outweighed the negligible returns of the investment, as demonstrated below.

---

[18]   Vanguard, Money Market Reform and Stable Value: Considerations for Plan Fiduciaries, Vanguard Commentary, at 5 (Aug. 2016), available at https://institutional.vanguard.com/iam/pdf/ISGSVMM.pdf?cbdForceDomain=true   (last visited August 18, 2017).



204.    Upon information and belief, not a single money market fund within the Plans' portfolio generated anything but a negative real return for the entirety of the Class Period.  Yet, despite poor market conditions and the relatively high fees associated with such funds, the Plans continued to include eight money market fund options each year.

205.    A prudent fiduciary would not include a money market fund in a plan following even three years of negative returns.  Instead, Defendants continued to include multiple money market funds, to the detriment of the Plans' participants.

206.    Because Defendants failed to employ appropriate methods to investigate the merits of the money market funds after years of near-zero short-term interest rates or engage in a prudent analysis to identify poorly performing investments, the Plans' participants holding investments in the money market funds had their retirement savings diminished on an inflation-adjusted basis.

207.    Even if after a careful review of the portfolios, Defendants determined that offering a money market fund was in the best interest of the participants, offering so many different versions of the same investment, all at different prices, was not.  A

prudent fiduciary would have selected the lowest-cost money market fund, rather than include many comparatively high priced iterations of the same investment.

208.   The Plans' highly unusual structure in diluting money market assets among a troop of Fidelity money market funds served only Fidelity's interest in collecting additional fees, not the Plans' interest in having a conservative option for risk-averse investors.

209.   A prudent fiduciary would not have included the money market funds nor maintained the money market funds in the Plans after so many years of negligible (or negative) returns.   The only reason to do so would be to benefit Fidelity.   As a result, Defendants breached their fiduciary duties owed to the Plans' participants.

**2.     The Company and Plan Administrator Defendants Failed to Monitor and Control Recordkeeping Costs**

**a.     Overview of Prudent Practices Related to Monitoring Defined Contribution Plan Recordkeeping**

210.   Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.   As a result of such competition, vendors vigorously compete for business by offering the best price.

211.   On average, administrative expenses — the largest of which, by far, is recordkeeping — make up 18% of total plan fees.   Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf ("ICI/Deloitte Study") (last

68

visited August 18, 2017).  These expenses can be paid in several ways: directly by the Plan sponsor, directly by participants on a per-capita or pro rata basis, or indirectly as a build-in component of the fees charged by the plan's investments.  *Id.* at 16.  When the latter practice is used, recordkeeping services are paid for either by third party investment managers, through payments commonly known as "revenue sharing" payments, or through the use of proprietary investments affiliated with the recordkeeper, whereby the recordkeeper discounts the cost of its services based upon the amount of plan assets invested in proprietary products.

212.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[19] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.  Nearly all recordkeepers in the marketplace offer this range of services, and plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services,

---

[19] Qualified Domestic Relations Order.

such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

213.   Generally, the cost of providing recordkeeping services depends on the number of participants in a plan.  A plan with a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis (regardless of whether those services are *paid* directly by participants or indirectly through the plan's investments).  While it is not *per se* imprudent to make alternative arrangements for recordkeeper compensation, such as through a revenue sharing system, it is critical that a plan's fiduciaries monitor the amount of compensation being received by the recordkeeper on a per-participant basis, to ensure the recordkeeper is not being paid more than reasonable compensation.

214.   Fiduciaries have a duty to monitor and control recordkeeping costs.  *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

215.   A plan must establish and execute a set of prudent processes for fiduciaries to fulfill their duty to monitor and control recordkeeping expenses.  First, fiduciaries must establish processes to monitor the direct compensation being received by the plan's

recordkeeper.  *See Tussey II*, 746 F.3d at 336 (affirming findings that the plan fiduciaries breached their fiduciary duties by failing "to … calculate the amount the Plan was paying … for recordkeeping").   A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

216.   Second, the fiduciary overseeing the recordkeeper must also identify *all* indirect forms of compensation being received by the recordkeeper, including (and especially) any discretionary or variable compensation, such as third-party revenue sharing payments, kickbacks from other service providers such as managed account or SDBA providers, and compensation resulting from the plan's use of the recordkeeper's proprietary investment products.

217.   Third, the fiduciary must also maintain awareness of the general marketplace for recordkeeping services to ensure the recordkeeper's compensation is not excessive.   This includes maintaining an awareness of overall trends in the marketplace for recordkeeping, including the fees being paid by similar plans.   *Id.* (plan fiduciaries' breaches included their failure to "determine whether [the recordkeeper's] pricing was competitive").   This also includes researching the rates generally being charged by the plan's recordkeeper to other plans.   This knowledge provides a critical leverage point in negotiations with the recordkeeper, and also acts to ensure that the plan's overall recordkeeping costs remain reasonable.   If the fiduciaries of a large plan (or plans) —

such as the Plans — lack the requisite level of sophistication or experience to conduct this type of analysis, a prudent fiduciary will hire a consultant to review the compensation being paid to the plan's recordkeeper as well as the operative recordkeeping contract.

218.    Fourth, if this analysis reveals that the recordkeeper's total compensation exceeds reasonable levels, or that the plan is not taking sufficient advantage of its bargaining power in the marketplace, a prudent fiduciary will demand a reduction in direct payments to the recordkeeper or negotiate a rebate of excess indirect compensation to the plan through either a revenue sharing account or direct rebates to participant accounts.  *See Tussey v. ABB, Inc.*, No. 06-cv-04305, 2012 WL 1113291, at *10 (W.D. Miss. Mar. 31, 2012) ("[A fiduciary] must use its 'purchasing power' to negotiate for rebates from [a service provider], either in the form of basis points or hard-dollar amounts, if the amount of revenue sharing generated exceeded market value for [the service provider's] services.").

219.    Finally, the plan's fiduciaries must periodically put the plan's recordkeeping services out to bid in the general marketplace, by conducting a Request for Proposal ("RFP") process.  This should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

**b.     The Company and Plan Administrator Defendants Failed to Monitor and Control the Plans' Recordkeeping Expenses**

220.   As Plan Administrator, the Company was responsible for overseeing the Plans' service providers, which included monitoring and controlling the Plans' recordkeeping expenses.  Plan Document, § 12.1.  The 401(k) Plan's recordkeeping agreement, attached as Exhibit 3, was executed by the Company, and grants the Company exclusive authority to execute, amend, and terminate the Trust Agreement.  Trust Agreement §§ 9(a), 13.[20]  The Trust Agreement grants the Company, as Plan Administrator, the authority to direct FMTC's performance of recordkeeping.  *Id.* § 6(a). The Plan Administrator Defendants had authority to carry out these functions under the terms of the Trust Agreement, as evidenced by Plan Administrator Defendant Mullin signing the Trust Agreement on behalf of the Company.  Trust Agreement at pp. 32, 38.

221.   The Trust Agreement does not set forth the recordkeeping compensation FMTC is to receive under the Agreement.  In fact on its face, the Trust Agreement makes it appear that FMTC is to receive little or no compensation for its performance of recordkeeping services.   The Trust Agreement outlines the recordkeeping and administrative services to be provided, then states they are to be provided for $0.00 per participant.  Trust Agreement Schedule B.  The Trustee fees are similarly waived.  *Id.* The Trust Agreement does provide that revenue sharing payments from third-party investment companies — which averaged between $300,000 and $360,000 per year

---

[20] The 403(b) Plan's trust agreement is identical in terms of its material terms.

during the Class Period — were payable to FIIOC, but then awards the Company an annual revenue credit of $300,000 to be used by the Company at its discretion to pay expenses related to the Plans.  On the face of the Trust Agreement, therefore, it might appear that Fidelity received only nominal compensation as the Plans' recordkeeper.

222.  These appearances were, in actuality, false.  Because while the Trust Agreement does not explicitly quantify FMTC's recordkeeping compensation, Schedule C lists the Plan's core investments, four of which (out of 13) are affiliated with Fidelity, and further provides that the Plans' menu of expanded investments shall include "[a]ll Fidelity Mutual Funds which are available for investment by Code Section 401(a) retirement plans . . . ."  Trust Agreement Schedule C.I, C.II at p. 49.  Thus, Fidelity derives nearly all of its recordkeeping compensation from the Plans' investments in proprietary Fidelity investments.  And the pricing of its recordkeeping services is based upon the explicit understanding that the Plans will continue to include proprietary Fidelity mutual funds in the Plans' investment lineup.  This is made clear in the last paragraph of the Fee Schedule, which states, "[t]hese fees are based on the Plan characteristics, **asset configuration**, net cash flow, **fund selection** and number of Participants existing as of the date of this agreement.  **In the event that one or more of these factors changes significantly**, fees may be subject to change after discussion and mutual agreement of the parties."  Trust Agreement Schedule B at p. 44 (emphasis added).

223.  Based on Plaintiffs' investigation and analysis of the market, given the number of participants in each Plan, the overall number of unique participants, the

amount of assets in the Plans, the manner in which the Plans were administered, and the specific services being provided by the Plans' recordkeeper, between 2011 to 2013 the Plans could have obtained recordkeeping services that were comparable to or superior to the services provided by Fidelity during this same time frame for between $30 and $40 per unique participant.

224.   Given the increase in the size of the Plans' assets and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, from 2014 through 2016, given the Plans' participant count, asset total, the manner in which the Plans were administered, and given the specific services provided by the Plans' recordkeeper, the Plans could have obtained recordkeeping services that were comparable to or superior to the services provided by Fidelity during this same timeframe for approximately $35 per unique participant.

225.   Had the Plans' fiduciaries conducted a review of Fidelity's general pricing of its recordkeeping services, and the contractual terms that it was offering to similar plans in the marketplace, the Company and the Plan Administrator Defendants would have discovered that in its standard recordkeeping contract with plans of similar size, Fidelity offered plans a direct offset against recordkeeping expenses for holding proprietary funds.   Around 2011, these offset amounts in Fidelity's standard recordkeeping contract were: 35 basis points for actively-managed equity and target-date

mutual funds (non-K shares),[21] 20 basis points for actively-managed equity and target-date mutual funds (K shares), 20 basis points for actively-managed bond and money market mutual funds (non-K shares), 10 basis points for enhanced index funds, and 10 basis points for Fidelity actively-managed CITs and SMAs.

226.    Pursuant to the terms of Fidelity's typical recordkeeping contract offered to plans similar in size to the Plans, these credits were used to offset a per-participant recordkeeping fee negotiated by the parties.  If the amount of the recordkeeping offsets exceeded the plan's total recordkeeping expenses, these offsets accumulated in a revenue sharing account, and the plan could use monies in the revenue sharing account either to pay other plan expenses, or the monies could be refunded to plan participants.  Given the Plans' considerable bargaining power in light of its number of participants and total assets—not to mention that Fidelity was already offering similar contractual terms to fiduciaries of similar plans—had the Plans' fiduciaries prudently leveraged their bargaining power in their negotiations with Fidelity, they could have procured recordkeeping services at a prudent per-participant fee level of between $30 to $40 per unique participant, with provisions for proprietary-fund recordkeeping offsets and accumulation of excess offsets in a revenue sharing account whose monies could be refunded to participants.

---

[21] As of 2011, among the approximately 184 Fidelity-affiliated mutual funds in the Plans, only 3 used the lower-cost K share class, despite the fact that dozens of the funds in the Plans offered these lower-cost K shares.

227.   Had the Plans operated under such provisions in 2012, the Plans would have accumulated in excess of $1.9 million in recordkeeping offsets and third-party revenue sharing payments, equal to approximately $76.20 per unique participant (Plaintiffs estimate that the Plans had 25,000 unique participants in 2012).   Pursuant to a prudent recordkeeping contract, the Plans' fiduciaries could have paid all recordkeeping expenses using the offsets and revenue sharing payments, and additionally refunded over $1 million directly to participant accounts.

228.   Similar results would have been achieved in every year since 2012 under a prudent recordkeeping arrangement with Fidelity.   In 2015, under similar terms, recordkeeping offsets and third-party revenue sharing payments would have been approximately $2.56 million, or $85.50 per unique participant (Plaintiffs assume there were approximately 30,000 unique participants in the Plans in 2015).   Had the Plans' fiduciaries also leveraged the Plans' bargaining power to negotiate prudent recordkeeping fees, the Plans' fiduciaries could have paid all recordkeeping expenses using offsets and revenue-sharing payments, and additionally refunded in excess of $1.65 million directly to participant counts.

229.   Overall, the Plans' have paid nearly $8 million in excess recordkeeping compensation to Fidelity during the Class Period as a direct result of the Company's and Plan Administrator Defendants' imprudent management of the Plans' recordkeeping function.   Fidelity has served as the Plans' recordkeeper for over 20 years, since 1995. The imprudence of these Defendants can be inferred from a number of factors:   (1) the use of the same recordkeeper for the past 22 years, without any indication that the Plans

ever engaged in an RFP process to look for a new recordkeeper; (2) a lack of changes to the Trust Agreement or compensation arrangement since mid-2012 despite a widespread trend towards lower recordkeeping fees and a significant increase in the Plans' assets and participant count; (3) the broad latitude granted to Fidelity in allowing them to insist upon the inclusion of all Fidelity funds in the plan lineup; (4) the Company's and Plan Administrator Defendants' failure to provide for explicit recordkeeping fee offsets within the Trust Agreement; and (5) the lack of any evidence that the Company engaged an expert or outside consultant to review the Plans' recordkeeping arrangements at any time during the Class Period.

230.   The availability of lower recordkeeping expenses was not at all contingent upon negotiating a more favorable recordkeeping offset or revenue sharing arrangement with Fidelity.  Despite the fact that Fidelity's revenue sharing payments to third-party recordkeepers are lower than the recordkeeping offsets Fidelity grants to its own recordkeeping clients, had the Company and Plan Administrator Defendants engaged in a prudent RFP process around 2010 and hired an outside recordkeeper at the prudent per-participant fee level cited above, *see supra*, the Plans' recordkeeping expenses would have been approximately $400,000 lower in 2012, and over $800,000 lower in 2015, saving the Plans' participants  approximately $3 million in recordkeeping costs during the Class Period.

### 3.     The Company and Plan Administrator Defendants Failed to Fully Disclose Fees Charged to Participants' Individual Accounts

231.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis" sufficient information regarding "fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto," so that participants can make informed decisions regarding their individual accounts.  29 C.F.R. § 2550-404a-5(a).

232.    In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate."  29 C.F.R. § 2550-404a-5(b)-(d).

233.    The Plan Administrator Defendants failed to properly disclose the fees charged to participants in the Plans in their quarterly statements, as can be seen in the quarterly statement of Plaintiff Larson for the period October 1, 2014 to December 31, 2014.  *See* Exhibit 4.   As shown on pages 5 through 25, Larson was charged an "Investment Adv. Fee" on a monthly basis for each investment in both of the Plans.  This term is not defined anywhere in the statement, but may be the monthly fee charged by ProManage, which itself is not identified on the statement.  There is no explanation of the

fee, or information on how the fee may be avoided by calling Fidelity and asking to be removed from the automatic enrollment in ProManage's PROgram.

234.    Similarly, each investment in both Plans is charged something simply identified as "Fees" on a quarterly basis.  There is no explanation of this term in the document's glossary, nor is there clear identification as to which entity is receiving the "Fees," or even what is the basis for these charges.  Without knowing the basis of the fees or who is receiving them, participants in the Plans cannot make informed decisions regarding these charges or assess their reasonableness.  This is also problematic because the Trust Agreement provides that participants in the 401(k) Plan are not to be charged an annual fee, and there is no way to tell whether these fees are prohibited annual fees.  *See* Trust Agreement at Schedule B.

235.    These ambiguous disclosures are a clear violation of the ERISA disclosure requirements imposed on all Plan administrators.

236.    Upon information and belief, these quarterly statements are sent by FMTC under the trade name "Fidelity Investments" on behalf of Allina to participants in both Plans.  As can been seen by Exhibit 4, if a participant was enrolled in both Plans, a single statement was sent to the participant with information for both Plans.

### VIII.   CLAIMS FOR RELIEF UNDER ERISA

237.    At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

238.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

239.   ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties impose upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

240.   ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to plan solely in the interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and family with such matters would use in the conduct of an enterprise of a like character and with like aims.

241.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty and prudence, and are the "highest known to the law." *Braden*, 588 F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982)). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor the merits of all the designated investment alternatives in a plan;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform then the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

242.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless

he makes reasonable efforts under the circumstances to remedy the breach.

243.    Plaintiffs bring this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) for both Plans to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a), and to obtain other appropriate relief.

### FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plans' Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

244.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

245.    At all relevant times, as alleged above, all Defendants, either acting on behalf of the Company or in their individual capacities, are/were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plans' assets.

246.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent and in the best interest of plan participants.  Defendants are liable for losses and excessive fees incurred as a result of investment options being imprudent, or as a result of Defendants' process for selecting and monitoring investments being imprudent or disloyal.

247.   A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

248.   Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

249.   Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period, these Defendants abdicated their fiduciary obligations, allowing Fidelity to lard the Plans with investments that benefitted Fidelity and its corporate partners at the expense of Plan participants.

250.   Defendants knew or should have known that, as described herein, the mutual fund investment portfolios of both Plans were flooded with Fidelity-affiliated investment options or options that returned a benefit to Fidelity-affiliated companies, rather than reasonable, prudent investments appropriate for inclusion in an ERISA retirement plan.  Additionally, Defendants diluted the significant bargaining power they had in letting the assets of the Plans be split among over 300 mutual fund options, rather than selecting fewer, higher quality investments they could systematically monitor.  Their

imprudent selection of so many mutual fund options, including 11 money market funds, led to participants in the Plans paying far more for similar investment options than was reasonable or prudent.   During the Class Period, despite their knowledge of the imprudence of the above investments, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable excessive costs and the loss of earnings that fell on participants of the Plans.

251.   Defendants additionally breached their duties to prudently and loyally manage the Plans' assets by failing to have in place a method of systematic review both of the Plans' individual investment options, the selection and retention of PROManage as the participants' automatic investment advisor, and of the portfolio as a whole in order to ensure that the investment options were suitable and appropriate for the objectives of the Plans.   If Defendants had had in place a prudent method of systematic review, the underperforming and excessively high fee mutual funds would have been replaced or the fees would have been negotiated lower or would have been reduced or eliminated.   Such a review process would have revealed that the Plans maintained significant assets, and that Defendants could have leveraged those assets to negotiate lower fees.

252.   Defendants further breached their duties of loyalty and prudence by failing to divest the Plans of the Fidelity proprietary funds when they knew or should have known that they were not suitable and appropriate Plan investments.

253.   Additionally, Defendants allowed the Plans to pay excessive recordkeeping fees by failing to adequately monitor the Plans' sole service providers and revenue sharing agreements to ensure that total recordkeeping fees were reasonable.

254. Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the self-interest of Fidelity in retaining excessively expensive and poorly performing proprietary fund investment options. Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

255. Lastly, Defendants also breached their duties to prudently and loyally manage the Plans' assets by including and maintaining multiple money market funds. By including the money market funds, Defendants allowed Plan participants to lose a significant amount of money due to high fees and the inflation adjusted negative growth rate of the money market funds.

256. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered significant losses.

257. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by the Company, Director, CAO, and HR Defendants)**

258. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

259. At all relevant times, as alleged above, the Company, Director, CAO, and HR Defendants (the "Monitoring Fiduciaries") are/were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

260. At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Monitoring Fiduciaries included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various committees and others to whom fiduciary responsibilities were delegated.

261. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are adequately performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know and reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

262. The Monitoring Fiduciaries breached their fiduciary monitoring duties by, among other things, (a) failing to monitor and evaluate the performance of the Plans' fiduciaries or have a system in place for doing so, standing idly by as the Plans suffered losses as a result of other Defendants' imprudent actions and inactions, (b) failing to monitor the processes and policies by which the Plans' investments were selected, evaluated, and periodically reviewed, allowing the Plans' assets to remain the imprudent investment options, (c) failing to remove the fiduciaries who had maintained the imprudent funds as investment options despite the excessive expense, and/or the poor

performance of the funds, (d) including ProManage's services on an opt-out rather than opt-in basis, and (e) failing to ensure ProManage charged reasonable fees for the services actually provided to participants in the Plans.

263.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those of the monitored fiduciaries, enabled the breaches by these Defendants, and failed to make any effort to remedy these breaches, despite having knowledge of them.

264.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, suffered significant losses.

265.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Monitoring Fiduciaries are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**THIRD CLAIM FOR RELIEF**
**Failure to Provide Disclosures to Participants Regarding Fees Charged**
**(Violation of ERISA § 404(a)(1)(A) and (B) and 29 C.F.R. § 2550.404a-5 by the**
**Company and Plan Administrator Defendants)**

266.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

267.    At all relevant times, as alleged above, the Company and Plan Administrator Defendants are/were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

268. At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to ensure that Plan participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

269. The Company and Plan Administrator Defendants failed to adequately disclose to participants and beneficiaries in the Plans all information regarding the investment options in the Plans, by among other things, (a) failing to disclose the exact nature of the fees and expenses charged to individual accounts in the Plans on both a monthly and quarterly basis, (b) failing to disclose how some of these fees and expenses might be avoided in the future, and (c) failing to disclose the arrangements between FMTC, FIIOC, and ProManage which led to ProManage's inclusion in the Plans as a service provider on an automatic basis, and (d) failing to adequately disclose who would receive these fees.

270. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, have paid excessive and unnecessary fees and suffered significant losses.

271.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29

U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans

caused by their breaches of fiduciary duties alleged in this Count.

## JURY DEMAND

272.    Plaintiffs demand a jury.

## PRAYER FOR RELIEF

273.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants

on all claims and requests that the Court awards the following relief:

A.      Certification of this action as a class action;

B.      Appointment of Plaintiffs as class representatives for the class, and

Plaintiffs' counsel as class counsel;

C.      A Declaration that the Defendants, and each of them, have breached their

fiduciary duties to the participants;

D.      An Order compelling the Defendants to make good to the Plans all losses to

the Plans resulting from Defendants' breaches of their fiduciary duties, including losses

to the Plans resulting from imprudent investment of the Plans' assets;

E.      An Order compelling Defendants to render an accounting;

F.      Imposing a surcharge against Defendants, in favor of the Plans, for all

amounts involved in transactions that such accounting reveals were or are improper,

excessive and/or in violation of ERISA;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.


Dated:  August 18, 2017                              Respectfully submitted,

                                                     **NICHOLS KASTER PLLP**

                                                     By:   /s/Kai H. Richter
                                                     Kai H. Richter, MN Bar No. 0296545
                                                     Carl F. Engstrom, MN Bar No. 0396298
                                                     4600 IDS Center
                                                     80 S 8th Street
                                                     Minneapolis, MN 55402
                                                     Telephone:  (612) 256-3200
                                                     Facsimile:  (612) 338-4878
                                                     krichter@nka.com
                                                     cengstrom@nka.com

                                                     **KESSLER TOPAZ MELTZER**
                                                     **   & CHECK, LLP**
                                                     Edward W. Ciolko
                                                     (*pro hac vice* motion to be filed)
                                                     Mark K. Gyandoh
                                                     (*pro hac vice* motion to be filed)
                                                     Julie Siebert-Johnson
                                                     (*pro hac vice* motion to be filed)
                                                     280 King of Prussia Road
                                                     Radnor, PA 19087
                                                     Tel:  (610) 667-7706
                                                     Fax:  (610) 667-7056
                                                     Email:  eciolko@ktmc.com
                                                     Email:  mgyandoh@ktmc.com
                                                     Email:  jsjohnson@ktmc.com

**BAILEY GLASSER LLP**
Gregory Y. Porter
(*pro hac vice* to be filed)
Mark G. Boyko
(*pro hac vice* to be filed)
8012 Bonhomme Avenue
Suite 300
Clayton, MO  63105
Telephone: (314) 863-5446
Facsimile: (314) 863-5483
gporter@baileyglasser.com
mboyko@baileyglasser.com

**IZARD KINDALL & RAABE LLP**
Robert A. Izard
(*pro hac vice* to be filed)
Mark P. Kindall
(*pro hac vice* to be filed)
Douglas Needham
(*pro hac vice* to be filed)
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@ikrlaw.com
mkindall@ikrlaw.com
dneedham@ikrlaw.com

*Counsel for Plaintiffs*

# APPENDIX A

Aberdeen U.S. Multi-Cap Equity Fund
AB Discovery Value Fund
American Beacon Balanced Fund
AllianzGI NFJ Small-Cap Value Fund
American Beacon International Equity Fund
American Beacon Large Cap Value Fund
American Beacon Small Cap Value Fund
American Century Large Company Value Fund
American Century Small Company Fund
American Century Ultra Fund
American Century Vista Fund[22]
American Century Heritage Fund
AMG Managers Special Equity Fund
AMG Managers Cadence Capital Appreciation Fund
AMG Managers Cadence Mid Cap Fund
AMG Managers Loomis Sayles Bond Fund
AMG Times Square Mid Cap Growth Fund
Ariel Appreciation Fund
Ariel Fund
Artisan International Fund
Artisan Mid Cap Fund
Artisan Mid Cap Value Fund
Artisan Small Cap Fund
Baron Asset Fund
Baron Growth Fund
Baron Small Cap Fund
BlackRock Total Return Fund[23]
Calvert Balanced Portfolio
Calvert Bond Portfolio
Calvert Capital Accumulation Fund
Calvert Equity Portfolio
Calvert Small Cap Fund
ClearBridge Value Trust
ClearBridge Aggressive Growth Fund
ClearBridge Large Cap Growth

---

[22] This Fund was available until 2013, when it was discontinued by the Fund Manager for poor performance and its assets rolled into the American Century Heritage Fund, which was immediately made available to participants in the Plans as an investment option.

[23] This Fund became available for investment in the Plans in 2014.

Columbia Acorn Select Fund
Columbia Income Opportunities
CRM Mid Cap Value Fund
DFA International Small Company Portfolio
DFA U.S. Targeted Value Portfolio
Deutsche Glocal Small Cap Fund
Deutsche CROCI International Fund
Deutsche CROCI Equity Dividend Fund
Domini Impact Equity Fund
Parametric Emerging Markets Fund[24]
Fidelity 130/30 Large Cap Fund[25]
Fidelity Asset Manager 20%
Fidelity Asset Manager 30%
Fidelity Asset Manager 40%
Fidelity Asset Manager 50%
Fidelity Asset Manager 60%
Fidelity Asset Manager 70%
Fidelity Asset Manager 85%
Fidelity Balanced Fund
Fidelity Blue Chip Growth Fund
Fidelity Blue Chip Value Fund
Fidelity Canada Fund
Fidelity Capital & Income Fund
Fidelity Capital Appreciation
Fidelity Government Cash Reserves
Fidelity China Region Fund
Fidelity Conservative Income Bond Fund
Fidelity Contrafund - Class K
Fidelity Convertible Securities Fund
Fidelity Corporate Bond Fund
Fidelity Disciplined Equity Fund
Fidelity Diversified International Fund – Class K shares[26]
Fidelity Dividend Growth Fund
Fidelity Emerging Europe, Middle East, Africa (EMEA) Fund
Fidelity Emerging Asia Fund
Fidelity Emerging Markets Discovery Fund

---

[24] The Plans apparently changed which share of this Fund would be available in the Plan in 2014, moving from the Institutional Class share to the R6 share.

[25] This option was only available in the 403(b) Plan until 2013, when it was removed from the marketplace for poor performance and its assets liquidated into another Fidelity-managed mutual fund option.

[26] Two separate share classes of this Fund were available in both Plans in 2011.  In 2012 and later, only Class K shares were available in the Plans.

Fidelity Emerging Markets Fund

Fidelity Equity Dividend Income Fund

Fidelity Equity Income Fund

Fidelity Europe Fund

Fidelity Europe Capital Appreciation Fund[27]

Fidelity Export and Multinational Fund

Fidelity Floating Rate High Income Fund

Fidelity Fifty Fund[28]

Fidelity Fund

Fidelity Focused High Income Fund

Fidelity Focused Stock Fund

Fidelity Four in One Index Fund

Fidelity Freedom 2000 Fund[29]

Fidelity Freedom 2005 Fund

Fidelity Freedom 2010 Fund

Fidelity Freedom 2015 Fund

Fidelity Freedom 2020 Fund

Fidelity Freedom 2025 Fund

Fidelity Freedom 2030 Fund

Fidelity Freedom 2035 Fund

Fidelity Freedom 2040 Fund

Fidelity Freedom 2045 Fund

Fidelity Freedom 2050 Fund

Fidelity Freedom 2055 Fund[30]

Fidelity Freedom 2060 Fund[31]

Fidelity Freedom Income Fund

Fidelity Global Commodity Stock Fund

Fidelity Global Balanced Fund

Fidelity Global High Income Fund

Fidelity Global Bond Fund[32]

Fidelity Global Strategies Fund

Fidelity Global Equity Income Fund[33]

---

[27] This Fund was closed by its manager and its assets were transferred into the Fidelity Europe Fund in March 2014. Both Funds were run by the same managers, both invested in Large Cap European Stock and had nearly identical top-10 holdings, sector allocations and performance. See *Adivser Fund Update*, February 28, 2014, available at https://www.adviserinvestments.com/pdf/contentmgmt/022814.pdf.

[28] This Fund was closed by its manager and its assets were transferred to Fidelity Focused Stock Fund in July 2015 due to huge outflows of the Fund's assets under management and the Fund's similarity to other offerings in Fidelity's lineup.

[29] This Fund was closed by its manager and its assets were transferred to the Fidelity Freedom Income Fund in 2014.

[30] This Fund first became available for investment for both Plans in 2012.

[31] This Fund first became available for investment for both Plans in 2015.

[32] This Fund first became available for investment for the 401(k) Plan in 2012 and for the 403(b) Plan in 2013.

[33] This Fund first became available for investment for both Plans in 2013.

Fidelity GNMA Fund

Fidelity Government Income Fund

Fidelity Government Money Market Fund

Fidelity Government Money Market Fund Premium[34]

Fidelity Growth and Income Portfolio

Fidelity Growth Company Fund - K Shares

Fidelity Growth Discovery Fund

Fidelity Growth Strategies Fund

Fidelity High Income Fund

Fidelity Independence Fund

Fidelity Inflation-Protected Bond Fund

Fidelity Intermediate Bond Fund

Fidelity Intermediate Government Income Fund

Fidelity International Bond Fund

Fidelity International Capital Appreciation Fund

Fidelity International Discovery Fund

Fidelity International Enhanced Index Fund

Fidelity International Growth Fund

Fidelity International Real Estate Fund

Fidelity International Small Cap Fund

Fidelity International Small Cap Opportunities Fund

Fidelity International Value Fund

Fidelity Investment Grade Bond Fund

Fidelity Japan Fund

Fidelity Japan Smaller Companies Fund

Fidelity Large Cap Core Enhanced Index Fund

Fidelity Large Cap Growth Fund[35]

Fidelity Large Cap Growth Enhanced Index Fund

Fidelity Large Cap Stock Fund

Fidelity Large Cap Value Enhanced Index Fund

Fidelity Latin America Fund

Fidelity Leveraged Company Stock

Fidelity Low Priced Stock Fund

Fidelity Magellan Fund

Fidelity Mega Cap Stock Fund

Fidelity Mid Cap Enhanced Index Fund

Fidelity Mid Cap Growth Fund[36]

---

[34] This Fund first became available for investment for both Plans in 2015.

[35] This Fund was closed by its manager and its assets were transferred into the Fidelity Stock Selector All Cap Fund in June 2013.

[36] This Fund was closed by its manager and its assets were transferred into the Fidelity Stock Selector Mid Cap Fund in January 2013.

Fidelity Mid-Cap Stock Fund

Fidelity Mid Cap Value Fund

Fidelity Money Market Fund

Fidelity Mortgage Securities Fund

Fidelity Money Market Fund - Premium Class[37]

Fidelity NASDAQ Composite Index Fund

Fidelity New Markets Income Fund

Fidelity New Millennium Fund

Fidelity Nordic Fund

Fidelity OTC Portfolio

Fidelity Overseas Fund

Fidelity Pacific Basin Fund

Fidelity Puritan Fund

Fidelity Real Estate Income Fund

Fidelity Real Estate Investment Portfolio

Fidelity Government Money Market

Fidelity Retirement Money Market Portfolio / Retirement Money Market II Portfolio[38]

Fidelity Select Air Transportation Portfolio

Fidelity Select Communications Equipment

Fidelity Select Consumer Finance Portfolio

Fidelity Select Industrials Portfolio

Fidelity Select Medical Equipment and Systems Portfolio

Fidelity Select Health Care Services Portfolio

Fidelity Select Multimedia Portfolio

Fidelity Select Natural Gas Portfolio

Fidelity Select Telecommunications Portfolio

Fidelity Select Automotive Portfolio

Fidelity Select Banking Portfolio

Fidelity Select Biotechnology Portfolio

Fidelity Select Brokerage and Investment Management Portfolio

Fidelity Select Chemicals Portfolio

Fidelity Select Computers Portfolio

Fidelity Select Construction & Housing Portfolio

Fidelity Select Consumer Discretionary Portfolio

Fidelity Select Consumer Staples Portfolio

Fidelity Select Defense and Aerospace Portfolio

Fidelity Select Semiconductors

Fidelity Select Energy Portfolio

Fidelity Select Energy Services

---

[37] This Fund was added to the Plans in 2015.
[38] The name of this Fund was changed in 2015.

Fidelity Select Environment and Alternative Energy Portfolio

Fidelity Select Financial Services Portfolio

Fidelity Select Gold Portfolio

Fidelity Select Health Care

Fidelity Select Industrials Equipment Portfolio

Fidelity Select Insurance Portfolio

Fidelity Select IT Services Portfolio

Fidelity Select Leisure

Fidelity Select Materials

Fidelity Select Money Market

Fidelity Select Natural Resources

Fidelity Select Pharmaceuticals Portfolio

Fidelity Select Retailing

Fidelity Select Software and IT Services Portfolio

Fidelity Select Technology

Fidelity Select Transportation

Fidelity Select Utilities Portfolio

Fidelity Select Wireless

Fidelity Short-Term Bond

Fidelity Small Cap Enhanced Index

Fidelity Small Cap Discovery

Fidelity Small Cap Growth

Fidelity Small Cap Stock

Fidelity Small Cap Value

Fidelity Stock Selector All Cap

Fidelity Stock Selector Large Cap Value

Fidelity Stock Selector Small Cap

Fidelity Stock Selector Mid Cap[39]

Fidelity Strategic Real Return

Fidelity Strategic Dividend & Income

Fidelity Strategic Income

Fidelity Telecom and Utilities

Fidelity Total Bond

Fidelity Total Emerging Markets Fund[40]

Fidelity Total International Equity

Fidelity Trend Fund

Fidelity Ultrashort Bond Fund[41]

Fidelity U.S. Government Reserves

---

[39] This Fund was added as an option to the 401(k) Plan in 2013 and to the 403(b) Plan in 2012.
[40] This Fund was added as an option for both Plans in 2012.
[41] This Fund was closed by its manager in 2014, due to large outflows of assets, and its assets liquidated.

Fidelity Treasury Money Market Fund[42]
Fidelity US Treasury Only Money Market Fund[43]
Fidelity Value Fund
Fidelity Value Discovery Fund
Fidelity Value Strategy Fund
Fidelity World Wide Fund
Franklin Mutual Global Discovery Fund
Franklin Mutual Shares Fund
Franklin Small-Mid Cap Growth Fund
Hartford Growth Fund[44]
Hartford Growth Opportunities Fund[45]
Hartford International Growth Fund
Hartford Small Cap Growth Fund
Invesco American Franchise Fund
Invesco Diversified Dividend Fund
Invesco Global Small & Mid Cap Growth Fund
Invesco Mid Cap Core Equity Fund
Invesco Comstock Fund
Invesco Constellation Fund[46]
Invesco Growth and Income Fund
Invesco Value Opportunities Fund
Invesco Equity and Income Fund
John Hancock Small Company Fund
Loomis Sayles Growth Fund
Loomis Sayles Small Cap Value Fund
Lord Abbett Affiliated Fund
Lord Abbett Mid Cap Stock Fund
Lord Abbett Small Cap Blend Fund[47]
Lord Abbett Value Opportunities Fund[48]
Morgan Stanley Institutional Growth Fund
Morgan Stanley Institutional Emerging Markets Leaders Fund
Morgan Stanley Institutional Core Plus Fixed Income Fund[49]

---

[42] This Fund was only available as an investment option in the Plans until 2013.

[43] This Fund became available as an investment option in the Plan in 2013.

[44] This Fund was closed by its manager in 2014 and its assets merged into Hartford Growth Opportunities Fund

[45] This Fund was added to both Plans as an option as soon as the Hartford Growth Fund merged into it in 2014.

[46] This Fund was closed by its manager in September 2013 and its assets merged with the Invesco American Franchise Fund.

[47] This Fund was closed by its manager in July 2013 and its assets merged with the Lord Abbett Value Opportunities Fund.

[48] This Fund became available in the Plans during Lord Abbett Small Cap Blend Fund merger in July 2013.

[49] This Fund was only available as an investment option in the 403(b) Plan until 2015, when it became available in both Plans.

Morgan Stanley Institutional Global Franchise Fund
Morgan Stanley Institutional International Equity Fund
Morgan Stanley Institutional Mid Cap Growth Fund
Morgan Stanley Institutional Small Company Growth Fund
Neuberger Berman Mid Cap Intrinsic Value Fund
Neuberger Berman Core Bond Fund
Neuberger Berman Focus Fund
Neuberger Berman Guardian Fund
Neuberger Berman High Income Bond Fund
Neuberger Berman International Equity Fund[50]
Neuberger Berman International Fund[51]
Neuberger Berman Large Cap Value Fund
Neuberger Berman Socially Responsible Fund
Oakmark Equity And Income Fund
Oakmark Fund
PIMCO Global Bond (Unhedged) Fund
PIMCO High Yield Fund
PIMCO Long-Term US Government Fund
PIMCO Low Duration Fund
PIMCO Real Return Fund – Admin Class
PIMCO Real Return Fund – Institutional Class
PIMCO Total Return Fund[52]
Rainier Small/Mid Cap Equity Fund
Royce Low Priced Stock Fund
Royce Opportunity Fund
Royce Total Return Fund
Royce Smaller Companies Growth Fund
Victory RS Partners Fund
Victory RS Small Cap Growth Fund
Victory RS Value Fund
Strategic Advisers International Multi-Manager Fund[53]
Strategic Advisers Core Multi-Manager Fund[54]
Strategic Advisers Emerging Markets Fund of Funds[55]

---

[50] This Fund became available for investment in the Plans in January 2013.
[51] This was closed by its manager in January 2013 and its assets merged with the Neuberger Berman International Equity Fund.
[52] This Fund was available in both Plans until 2014, when it was removed by the Plan Administrators and/or FMTC and replaced with the BlackRock Total Return Fund.
[53] This Fund was only available for investment in the 401(k) Plan, beginning in 2012.
[54] This Fund became available for investment in both Plans in 2014.
[55] This Fund was available for investment in the 401(k) Plan beginning in 2014, but was available in the 403(b) Plan in 2012.

Strategic Advisers Growth Multi-Manager Fund[56]
Strategic Advisers Income Opportunities Fund of Funds[57]
Strategic Advisers Small-Mid Cap Multi-Manager Fund[58]
Strategic Advisers Value Multi-Manager Fund[59]
Spartan/Fidelity 500 Index[60]
Spartan/Fidelity Emerging Markets Index
Spartan/Fidelity Extended Market Index
Spartan/Fidelity Global ex US Index[61]
Spartan/Fidelity Intermediate Treasury Bond Index
Spartan/Fidelity International Index Fund
Spartan/Fidelity Long-Term Treasury Bond Index
Spartan/Fidelity Short-Term Treasury Bond Index
Spartan/Fidelity Total Market Index
Spartan/Fidelity Real Estate Index
Spartan/Fidelity Mid Cap Index[62]
Spartan/Fidelity Small Cap Index
Spartan/Fidelity US Bond Index
Spartan/Fidelity Inflation-Protected Bond Index[63]
TCW Select Equities Fund
Templeton Developing Markets Fund
Templeton Foreign Fund
Templeton Foreign Smaller Companies Fund
Templeton Global Bond Fund
Templeton Growth Fund
Templeton World Fund
Templeton Global Smaller Companies Fund[64]
Touchstone Sands Capital Select Growth Fund
Vanguard Wellington Fund
Virtus Mid-Cap Value or Contrarian Value Fund
Virtus Small-Cap Core Fund
Wells Fargo Small Company Value Fund

---

[56] This Fund was only available for investment in the 401(k), beginning in 2013.
[57] This Fund became available for investment in both Plans in 2014.
[58] This Fund was only available for investment in the 401(k) in 2013 and part of 2014.
[59] This Fund was only available for investment in the 401(k), beginning in 2013.
[60] This Fund was only available for investment in the Plans until 2012.
[61] This Fund was only available for investment in the 401(k) Plan in 2011, but became available in the 403(b) Plan the following year.
[62] This Fund was only available for investment in the 401(k) Plan in 2011, but became available in the 403(b) Plan the following year.
[63] This Fund was available for investment in both Plans beginning in 2012.
[64] This Fund was available for investment in both Plans beginning in 2012.

Wells Fargo C&B Mid Cap Value Fund[65]
Wells Fargo Small Cap Value Fund
Wells Fargo Special Mid Cap Value Fund
Western Asset Core Bond Fund
Western Asset Core Plus Bond Fund

---

[65] This Fund, the Wells Fargo Small Cap Value Fund, and the Wells Fargo Special Mid Cap Value Fund were available for investment for each year of the Class Period, but in a different share class beginning in 2015.